UNITED STATES of America, Appellant,

v.

John J. CASSESE, Defendant–Appellee.

No. 03–1710.

United States Court of Appeals, Second Circuit.

Argued: Nov. 22, 2004.

Decided: Oct. 24, 2005.

Steven R. Glaser, Assistant United States Attorney (Deirdre A. McEvoy, Adam B. Siegel, Gary Stein, Assistant United States Attorneys, on the brief) for David N. Kelley, United States Attorney for the Southern District of New York, New York, NY, for Appellant.

Alexandra A.E. Shapiro, Latham & Watkins LLP, New York, N.Y. (David M. Brodsky, Noreen A. Kelly–Najah, Jennifer L. Herring, on the brief), for Defendant–Appellee.

Before: CALABRESI, B.D. PARKER, and RAGGI, Circuit Judges.

B.D. PARKER, JR., Circuit Judge.

The Government appeals a judgment of acquittal in the United States District Court for the Southern District of New York (Sweet, *J.*) following the conviction of John J. Cassese for violating Section 14(e) of the Securities Exchange Act of 1934 ("1934 Exchange Act") and Rule 14e–3 by committing fraud in connection with a tender offer. *See* 15 U.S.C. §§ 78n(e), 78ff; 17 C.F.R. § 240.14e–3(a). The Government charged that Cassese, the CEO of Computer Horizons Corporation, illegally purchased 15,000 shares of Data Processing Resources Corporation ("DPRC") stock after he learned from Compuware that it planned to acquire DPRC.

On appeal, the Government contends that the District Court erred in requiring proof of Cassese's belief that the Compuware/DPRC transaction was, or was likely to be, structured as a tender offer, and the Government only needed to show that Cassese believed his transactions were unlawful to prove that he acted willfully. The Government also contends that it adduced sufficient evidence of Cassese's willfulness, and, that the District Court abused its discretion in conditionally granting Cassese a new trial. We do not reach the first or third of these contentions, because we conclude that the Government—giving it all the presumptions to which it is entitled—failed to prove beyond a reasonable doubt that Cassese willfully violated Rule 14e–3 even under the more relaxed definition of willfulness it proposes. Consequently, we affirm the judgment of acquittal.

## BACKGROUND

### I

Cassese was the Chairman and President of Computer Horizons Corporation, a New Jersey-based information technology services company. In April 1999, Computer Horizons entered into merger discussions with Compuware, a publicly traded company in the same line of business, and a meeting between executives of the two companies resulted in a proposal by Compuware to purchase Computer Horizons. The proposal consisted of a letter of intent with a proposed confidentiality agreement, both of which were forwarded to Computer Horizons on May 4, 1999 by Compuware's investment banker Barry Goldsmith. *See United States v. Cassese*, 290 F.Supp.2d 443, 446 (S.D.N.Y. Nov.13, 2003) (*Cassese II* ).

In the Letter of Intent, Compuware offered Computer Horizons $22.50 per share for all outstanding shares and stated that the transaction would take place through either a tender offer or a cash merger. Cassese personally stood to gain $33 million in cash if the deal had gone through. The Board of Directors of Computer Horizons rejected Compuware's offer as too low, but Cassese continued to discuss the merger with Goldsmith. Later in May 1999, Goldsmith called Cassese and told him that it was unlikely that Compuware would acquire Computer Horizons at that time.

At about the same time that Compuware had initiated merger discussions with Computer Horizons, it also contacted DPRC about the possibility of a merger. DPRC was a publicly traded company based on the West Coast that was similar in size and lines of business to Computer

Horizons. DPRC and Compuware met in April and May of 1999, and by the beginning of June, the DPRC Board of Directors had approved a merger of the two companies. *See id.*

On June 17, 1999, Goldsmith asked the Chief Executive Officer of Compuware, Peter Karmanos, Jr., to call Cassese to inform him that Compuware was going to buy another company and that Compuware might be interested in acquiring Computer Horizons at some point in the future. At the time he made the phone call, Karmanos had not been involved in his company's negotiations with Computer Horizons and was not aware that an offer had been made to Computer Horizons. On June 21, 1999, Karmanos spoke with Cassese by phone and told him that Compuware would not be doing a deal with Computer Horizons at that time, but might be interested in purchasing it in the future. During the conversation, Karmanos also told Cassese that Compuware was going to announce a deal with DPRC but did not divulge any details about the terms or structure of the proposed transaction.

The next day, June 22, 1999, Cassese, who had previously owned shares of DPRC, purchased 15,000 shares of DPRC stock in his own name in two of his brokerage accounts. He called Joseph Moschella, a friend of his son's and a broker at Morgan Stanley, but could not reach him. He then called Michael Pizzutello, his broker at Merrill Lynch, and placed an order for 10,000 shares. A short time later, when Moschella called him back, Cassese placed an order for an additional 5,000 shares of DPRC and, in order to cover the cost of the purchase, sold another stock in his portfolio.

On June 24, 1999, Compuware announced that it would make a tender offer for all outstanding shares of DPRC. Later that day, Moschella informed Cassese of the merger announcement and the current trading price of the stock. Moschella testified at trial that Cassese sounded surprised when Moschella told him about the tender offer announcement. Cassese asked Moschella to sell the DPRC shares in his Morgan Stanley account, and Cassese made a profit of approximately $49,000 on the sale. Approximately twenty minutes later, Cassese called Donald Pizzutello (Michael Pizzutello's father and partner) and asked him to sell the DPRC shares in his Merrill Lynch account. Cassese made a profit of almost $100,000 on this second sale, contributing to a combined profit of about $149,000. Sometime after Donald Pizzutello sold Cassese's DPRC shares in the Merrill Lynch account, Cassese asked him if he could cancel the trades, and Pizzutello told him that the trades could not be undone. When interviewed by FBI agents several years later, Pizzutello did not remember Cassese asking him if he could cancel the trades. However, when Pizzutello told Cassese about the interview, Cassese reminded him of the cancellation call and urged him to call the FBI back and set the record straight, which Pizzutello did.

In August 1999, approximately two months after Cassese's DPRC transactions, Cassese and Goldsmith discussed Cassese's purchase of DPRC stock, and Goldsmith testified at trial that he recalled Cassese admitting to him during that conversation, in substance, that "he had made a stupid mistake." (Tr. 206). Goldsmith explained in his testimony that he understood Cassese to mean that he had done something that "he should not have done," but Goldsmith did not recall Cassese saying that he felt he had done anything wrong. (Tr. 208, 251–52). Goldsmith also testified that he had the impression Cassese was "upset or angry" but that it was

not clear to him why. (Tr. 208–09, 252–53).

## II

On February 25, 2002, the SEC filed a complaint against Cassese for insider trading in DPRC securities. Cassese consented to the entry of judgment against him, and agreed to pay disgorgement in the amount of $150,937.50, prejudgment interest of $19,512.84, and a civil penalty of $150,937.50. *Cassese II*, 290 F.Supp.2d at 444.

A year later, in March 2003, Cassese was indicted on two counts of insider trading for violating Sections 10(b) and 14(e) of the 1934 Exchange Act. *See* 15 U.S.C. §§ 78j(b), 78n(e), 78ff; 17 C.F.R. §§ 240.10b–5, 240.14e–3. The District Court concluded that Cassese owed no fiduciary duty to Karmanos or Compuware and dismissed the count predicated on Section 10(b). *United States v. Cassese*, 273 F.Supp.2d 481, 485–88 (S.D.N.Y. July 23, 2003) (*Cassese I*). The count charging a violation of Section 14(e) and Rule 14e–3 proceeded to trial, which began on September 15, 2003 and lasted six days. The Court declared a mistrial after the jury was unable to reach a unanimous verdict.

A second trial on the Section 14(e) count commenced on September 29, 2003, and after four days, the jury rendered a guilty verdict. In the second trial, after the Government concluded its case, Cassese moved for a judgment of acquittal pursuant to Rule 29. *See* Fed.R.Crim.P. 29. He advanced a number of arguments in support of the motion, including a contention that under Section 14(e) the Government was required, but failed, to prove that Cassese knew the transaction was a tender offer and that the Government's evidence of criminal intent was circumstantial and consistent with his innocence, or at most, equally supported inferences of innocence and guilt. This motion was denied at that time without prejudice to its later renewal. Following the guilty verdict, Cassese renewed his Rule 29 motion, which Judge Sweet granted in a thoughtful opinion. *Cassese II*, 290 F.Supp.2d at 445.

The District Court concluded that, in criminal prosecutions under Section 14(e) and Rule 14e–3, where no other securities laws violations are alleged, the Government, to prove willfulness, must prove that the defendant believed that the material non-public information he traded upon related to, or most likely related to, a tender offer. *Cassese II*, 290 F.Supp.2d at 448–57. The Court concluded that the evidence at trial was insufficient to support the jury's finding that Cassese acted with criminal intent. *Id.* The District Court also held, in the alternative, that a new trial would be warranted should this Court reverse the judgment of acquittal. *Id.*

On appeal, the Government takes issue with each of these conclusions. Because we believe the Government's proof of criminal intent was insufficient even under its more expansive theory of willfulness, we do not reach the difficult question of whether the Government must prove that a defendant believed a transaction related to a tender offer where only a violation of Section 14(e) is charged. We review *de novo* this insufficiency question. *United States v. Reyes*, 302 F.3d 48, 52 (2d Cir.2002).

## Discussion

### I

Rule 14e–3 states:

If any person has taken a substantial step or steps to commence, or has commenced, a tender offer ..., it shall constitute a fraudulent, deceptive or manipulative act or practice within the

meaning of section 14(e) of the Act for any other person who is in possession of material information relating to such tender offer which information he knows ... is nonpublic and which he knows ... has been acquired directly or indirectly [from one of the parties involved in the tender offer to purchase or sell certain securities].

17 C.F.R. § 240.14e–3(a).

■ To begin, we note that although civil liability follows from any violation of the securities laws regardless of whether the violation was willful, in order to establish a criminal violation of the securities laws, the Government must show that the defendant acted willfully. 15 U.S.C. § 78ff(a). This Court has defined willfulness as "a realization on the defendant's part that he was doing a wrongful act" under the securities laws, *United States v. Peltz*, 433 F.2d 48, 55 (2d Cir.1970), in a situation where the " 'the knowingly wrongful act involved a significant risk of effecting the violation that has occurred,' " *Metromedia Co. v. Fugazy*, 983 F.2d 350, 364 (2d Cir.1992) (quoting *Peltz*, 433 F.2d at 55).

The Government argues that it was not required to prove that Cassese believed that he was violating a particular law, nor that he knew he was violating a rule that governed trading related specifically to a tender offer. Instead, the Government contends, all that was needed was proof beyond a reasonable doubt that Cassese realized that he was committing a wrongful act. The Government contends that the evidence showed that Cassese believed it was unlawful to trade securities based upon insider information when he purchased DPRC shares, and that this realization was enough to establish a willful violation of Rule 14e–3 even if he was not aware that the trades violated a rule regulating trading in connection with tender offers. But even under the Government's relaxed theory of criminal liability, we conclude that it did not adduce enough evidence to prove beyond a reasonable doubt that Cassese believed that he was acting unlawfully.

## II

■ Following a jury verdict of guilty, we reverse a district court's judgment of acquittal on grounds of insufficient evidence if we determine that "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Espaillet*, 380 F.3d 713, 718 (2d Cir.2004) (emphasis in original) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). In this vein, "the defendant who is challenging the sufficiency of the evidence bears a heavy burden." *Id.* (internal quotation marks omitted). However, the defendant's heavy burden is not insurmountable. A district court's judgment of acquittal must be upheld if "no rational trier of fact could have found the defendant guilty beyond a reasonable doubt." *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir.2003); *see also United States v. Glenn*, 312 F.3d 58, 63 (2d Cir.2002).

In applying these principles, we, of course, are careful to avoid usurping the role of the jury since Rule 29 "does not provide the trial court with an opportunity to substitute its own determination of ... the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *Espaillet*, 380 F.3d at 718; *see also United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir.1999). Additionally, and of critical importance, the evidence must be viewed in its totality, *Glenn*, 312 F.3d at 69, "as each fact may gain color from

others," *Guadagna,* 183 F.3d at 130. But at the end of the day, "if the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *Glenn,* 312 F.3d at 70 (internal quotation marks omitted).

Here, the question is whether the evidence, viewed in its entirety, was sufficient to support a jury's finding that Cassese willfully violated the securities laws. The Government contends that it provided substantial evidence on this point that, viewed as a whole and with all permissible inferences drawn in its favor, supported the verdict and that the District Court erred when it reached a different conclusion. We disagree.

The Government's proof at trial that Cassese willfully violated a criminal law consisted of five pieces of evidence: (1) Cassese's use of two brokerage accounts; (2) the timing of the DPRC purchase; (3) Cassese's desire to cancel the trades; (4) Cassese's conversation with Goldsmith; and (5) the Proposed Confidentiality Agreement. *Cassese II,* 290 F.Supp.2d at 452–456.

The Government argues that this evidence, when taken together, demonstrates Cassese's willfulness. First, his use of multiple accounts suggests that he was attempting to conceal his unlawful activity. Second, evidence that he tried to undo or "break" the trade and the fact that at some point after the trade, he told Goldsmith that he had made a "mistake" when he purchased the DPRC stock, demonstrate his consciousness of guilt. Third, the fact that Cassese stood to receive significant personal financial benefits in the event of a Compuware–Computer Horizons transaction, and his anger when he learned the transaction would not be con-

summated, offer proof of his motive for engaging in unlawful conduct. Finally, the Confidentiality Agreement pertaining to a proposed transaction between Compuware and Computer Horizons, which was faxed to Cassese, specifically warned him that trading upon information received pursuant to the merger negotiations might violate the federal securities laws and made him aware that his purchase of DPRC shares was potentially unlawful.

Before analyzing the Government's evidence, it is helpful to keep in mind the context in which the trades occurred. In purchasing the DPRC shares, Cassese did not breach any fiduciary duty, nor did he misappropriate any confidential information. *See Cassese I,* 273 F.Supp.2d at 485–88. The information Cassese had received was not related to Computer Horizons or to any company in which he could be considered an insider by virtue of a directorship or otherwise. Accordingly, he was under no legal duty to refrain from trading on the information by virtue of being an insider, or to keep it confidential. Finally, and significantly, the Government did not prove—and does not contend—that, when Cassese traded, he knew DPRC would be the subject of a tender offer. In other words, the Government contends it proved willfulness despite the lack of any of the traditional warning signals that would put one on notice that he ought to refrain from trading.

### (1) Cassese's Use of Two Brokerage Accounts

■ The Government argues that the jury was permitted to conclude that Cassese placed smaller trades in separate accounts in order to reduce the risk of detection of conduct he believed to be unlawful. It rests this conclusion on the fact that Cassese purchased DPRC shares through two different brokerage accounts, and that

this was the only instance in which he purchased the same security through multiple accounts on the same day.

This argument is, simply stated, frivolous. It is commonplace for investors to maintain accounts with different broker-dealers. Brokers and brokerage houses have different strengths and specialities. Investment objectives, strategies and results change over the years, making changes in brokers a natural, and indeed common, occurrence. Brokers come and go, and many investors choose to leave relationships to desuetude rather than to sever them. Consequently, for any number of personal as well as investment-related reasons, a great many investors prefer to maintain relationships with multiple brokerage houses. Since Cassese had long had accounts at several firms, and in the past had held the same stock in different accounts, his use of two accounts to purchase DPRC shares—at least in the absence of more proof from the Government—could have easily been the result of random circumstances.

The evidence reveals that Cassese initially called Moschella to place an order in his Morgan Stanley account but did not reach him. Cassese then called Pizzutello and placed an order for 10,000 shares of DPRC with his firm. And when Moschella returned his call, Cassese told him to sell his shares in another company and to purchase 5,000 shares of DPRC, thereby realizing a substantial profit on the sold shares and giving his son's friend a commission. It is reasonable to conclude that Cassese initially may have intended only to ask Moschella to make the purchase, placed an order with Pizzutello when he could not reach Moschella, and then went ahead and placed a second order with Moschella when he called back because Cassese wanted to realize his profit on another investment and to give his son's friend a

commission. The fact that Cassese left a message for Moschella and only placed an order with him when he called back, after Cassese had already instructed Pizzutello to purchase DPRC shares, is, again, entirely consistent with innocence. More to the point, under the circumstances of this case, the existence of the two accounts provided no viable proof of criminal intent.

Cassese purchased the DPRC shares in his own name, not through a nominee. The Government did not dispute that he was well aware, as a consequence of years as an investor, of the paper trail generated by trading activity, including the confirmation slips and the monthly statements he received at home. The Government's contention that Cassese thought two trades of 10,000 shares costing $132,500 and 5,000 shares costing $66,250, respectively, would go undetected, but that a trade of 15,000 shares costing $198,750 would not, is not plausible since the two trades would have generated twice the paper trail of the single transaction. Moreover, the sizes of the DPRC transactions were consistent with Cassese's prior trading practices. For example, he had previously effected trades as high as $300,000 in his Morgan Stanley account and as high as $400,000 in his Merrill Lynch account. We are baffled as to why the Government believes that conduct that substantially increases the risk of apprehension can, at the same time, constitute proof of concealment.

### (2) Cassese's Attempt to "Break the Trade"

■■ The Government also argues that because Cassese asked Donald Pizzutello to undo the trade sometime after Pizzutello sold the DPRC shares in Cassese's Merrill Lynch account, the jury could properly infer that Cassese knew it was unlawful to purchase DPRC shares when he *did*. Here too we are unpersuaded. The fact

that Cassese later inquired about canceling the trades supplies only a modicum of information about his intentions at the relevant time—that is, when he bought the stock. This is especially so since Moschella's trial testimony was that Cassese was surprised to hear the tender offer announcement. The District Court properly concluded that Cassese's attempt to cancel the trades reflects his attitude on the day he sold the stock, not the day he bought it. *Cassese II,* 290 F.Supp.2d at 454. Given that Cassese was acting on public information when he eventually sold DPRC shares, and Rule 14e–3 specifically proscribes trading on non-public information, only his mind set on the day he purchased the shares is relevant. If Cassese did not realize the purchase was unlawful until June 24—the day the tender offer was publicly announced—and sought to break the trade for that reason, he would not have willfully violated Rule 14e–3 when he purchased the shares. Furthermore, the District Court correctly held that although evidence of after-the-fact consciousness of guilt may have independent probative force, and may strengthen inferences supplied by other pieces of evidence, such evidence is "insufficient proof on which to convict where other evidence of guilt is weak and the evidence before the court is as hospitable to an interpretation consistent with the defendant's innocence as it is to the Government's theory of guilt." *United States v. Johnson,* 513 F.2d 819, 824 (2d Cir.1975); *Glenn,* 312 F.3d at 69; *see also United States v. Scheibel,* 870 F.2d 818, 822 (2d Cir.1989).

In addition, the inference of guilt the Government seeks to draw is further undermined by Pizzutello's testimony that it was Cassese who reminded him of the cancellation call and urged him to call the FBI back to set the record straight regarding the call. If the Government's inference were correct—that from the begin-

ning Cassese sought to conceal the trade—it is highly implausible that he would urge Pizzutello to correct his statement to the FBI about information the Government regards on appeal as so damaging. In any event, viewed objectively, this consciousness-of-guilt evidence is as consistent with innocence as with guilt. To the extent Cassese sought to cancel the trade because he realized that the stock purchase was unlawful, it is equally possible that he realized this on the day he sought to cancel the trade as on the day of the purchase. Even accepting *arguendo* the Government's analysis, this bit of evidence does relatively little to advance the Government's case to the beyond-a-reasonable-doubt threshold.

### (3) Cassese's Statement to Goldsmith

The Government argues that based on Goldsmith's testimony that Cassese admitted to him that "he had made a stupid mistake," the jury was entitled to infer that Cassese had in effect admitted that he had purchased DPRC stock while knowing it was wrong to do so. We disagree. Goldsmith testified that he only had a "vague recollection" and "[didn't] recall the specific words" of the conversation. (Tr. 208). Moreover, he testified that he did not recall Cassese admitting to any wrongdoing. Most importantly, the conversation with Goldsmith took place two months after Cassese purchased the stock. Even when considered along with the Government's other evidence, Goldsmith's testimony is weak evidence as to Cassese's state of mind at the time of the purchase, for even if Cassese realized one day after making the purchase that it was a mistake to do so because it was potentially unlawful, he would not be liable for violating Rule 14e–3. Viewing this bit of evidence in a light most favorable to the Government, the fact that Cassese may have felt he made a mistake two months after the

trades makes, at best, the most modest of contributions to the Government's responsibility of proving beyond a reasonable doubt that Cassese willfully violated the securities laws.

### (4) Evidence as to Cassese's Motive

 The Government argues that the jury could properly rely on evidence adduced at trial regarding Cassese's motive. Specifically, the Government points to Cassese's substantial financial stake in completion of the Compuware–Computer Horizons transaction ($33 million), and his anger following the deal's collapse. As further proof of Cassese's motive, the Government also focuses on Goldsmith's testimony that Cassese acknowledged to him that he was motivated by anger when he decided to purchase the DPRC shares. Specifically, the Government claims that Cassese admitted to Goldsmith that he purchased DPRC stock because he was upset about the fact that his company was not going to be purchased.

This contention by the Government rests on the thinnest of evidentiary predicates. Goldsmith testified:

Q: When you spoke to John Cassese in August of 1999, is it your recollection that he said that he was upset, or is that your conclusion?

A: I have a vague recollection. I don't know if those were the actual words, but that is my impression of what I took away.

. . .

Q: With respect to the question the government asked you at the end about your conversation with Mr. Cassese in August, did he say to you in words or substance that the reason he bought the DPRC stock on June 22nd was that he was upset abut the Compuware–CHC Computer Horizons deal not going through?

A: Again I don't recall the specific words, but that was the impression that I got when I talked to him.

(Tr. 208). Further, Goldsmith was never certain as to what, if anything, Cassese was upset about. The District Court made two observations about the Government's theory of motive. First, Goldsmith's testimony did little to prove the Government's theory. Second, even had the Government proved that Cassese was motivated by anger, "[t]he securities laws do not prohibit people from purchasing stock when they are angry." *Cassese II*, 290 F.Supp.2d at 455. Both observations are correct. Purchasing as a consequence of anger does not equate to willful violation of the securities laws.

### (5) The Confidentiality Agreement

 Pointing to the Confidentiality Agreement faxed to Cassese along with the May 4, 1999 Letter of Intent, which specifically warned that trading upon information received pursuant to merger negotiations with Compuware might violate the securities laws, the Government argues that the jury was permitted to infer that Cassese read the Confidentiality Agreement, and was specifically on notice that his purchases of DPRC shares based on information from Compuware would be illegal. Although the evidence established that Cassese received the document, Cassese never signed the document, and the Government adduced no evidence that he read it. The District Court properly instructed the jury that it should only consider the proposed Confidentiality Agreement if it had been shown that Cassese read the document. *Cassese II*, 290 F.Supp.2d at 455 n. 12. Since we presume that jurors follow the Court's instructions, *see United States v. Joyner*, 201 F.3d 61, 69–70 (2d Cir.2000), and since there is simply no evidence in the record that

Cassese read the document, we are confident that it played no part in the jury's deliberations. As the District Court properly concluded, the Confidentiality Agreement "has no probative value with respect to Cassese's intent." *Cassese II*, 290 F.Supp.2d at 455.[1]

Since few events in the life of an individual assume the importance of a criminal conviction, we take the "beyond a reasonable doubt" requirement with utmost seriousness. Here, we find that the Government's evidence failed to reach that threshold. As discussed above, viewed singly, each of the areas of proof by the Government was characterized by modest evidentiary showings, equivocal or attenuated evidence of guilt or a combination of the three. More importantly, when the evidence is viewed in its totality, the evidence of willfulness is insufficient to dispel reasonable doubt on the part of a reasonable fact finder. Viewed in the light most favorable to the prosecution, the evidence, at best, gives "equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence," and thus "a reasonable jury must necessarily entertain a reasonable doubt." *Glenn*, 312 F.3d at 70 (citation omitted).

## CONCLUSION

For the foregoing reasons, we affirm the District Court's judgment of acquittal.

1. Finally, the Government, at oral argument, emphasized Cassese's prior business experience as important evidence supporting its theory of willfulness. The Government argues that the jury was entitled to infer that the CEO of a publicly traded company with twenty-seven years of business experience would be familiar with the securities laws and the manner in which trades are monitored by securities regulators, and that his actions support the theory that he willfully violated the securities laws. However, although the Government's evidence establishes that Cassese was familiar with some aspects of securities

RAGGI, Circuit Judge, dissenting.

On this appeal from a judgment of acquittal after a jury verdict of guilty, the government challenges the district court's construction of "willfulness" for purposes of Securities and Exchange Commission ("SEC") Rule 14e–3(a). *See* 17 C.F.R. § 240.14e.3(a). The district court concluded that willfulness required the government to prove that the defendant, John J. Cassese, knew that the nonpublic information on which he traded "related to, or most likely related to, a tender offer," which the government failed to do. *United States v. Cassese*, 290 F.Supp.2d 443, 450, 452 (S.D.N.Y.2003). The majority finds it unnecessary to reach this issue, concluding that, even if willfulness only requires proof that Cassese generally understood the unlawfulness of his actions, the government failed to carry its burden. Because I do not agree either with the majority's sufficiency conclusion or with the district court's construction of willfulness as it applies to Rule 14e–3(a), I respectfully dissent.

1. *The Majority's Conclusion that the Government Failed to Prove Willfulness*

a. *Sufficiency Review*

"Willfulness" is the element that converts a civil violation of Rule 14e–3(a) into

law, the Government adduced no evidence showing that Cassese ever participated in a tender offer or that he had any familiarity with the laws pertaining to tender offers. In any event, we easily conclude that Cassese's prior experience is a fact as consistent with his innocence as with the Government's theory of guilt. Cassese could have believed that he was entitled to trade on Karmanos' information since it did not relate to his company, he was not involved in the deal, he had no fiduciary relationship with Karmanos or Compuware, and he had no reason to believe that the transaction would be a tender offer.

a felony crime. *See* 15 U.S.C. § 78ff(a) ("Any person who willfully violates any provision of this chapter ..., or any rule or regulation thereunder the violation of which was made unlawful ... shall upon conviction be fined not more than $5,000,000, or imprisoned not more than 20 years, or both."). "As a general matter, when used in the criminal context, a 'willful' act is one undertaken with a 'bad purpose.' In other words, to establish a 'willful' violation of a statute, 'the Government must prove that the defendant acted with knowledge that his conduct was unlawful.'" *Bryan v. United States,* 524 U.S. 184, 191–92, 118 S.Ct. 1939, 141 L.Ed.2d 197 (1998) (quoting *Ratzlaf v. United States,* 510 U.S. 135, 137, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994)).

In evaluating the sufficiency of the evidence of Cassese's willfulness under this standard, the court employs the familiar test articulated in *Jackson v. Virginia,* which asks whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" on the evidence adduced. 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original). If the answer is yes, the jury verdict of guilty cannot be set aside. *See id.* This standard of review draws no distinction between direct and circumstantial evidence. Indeed, the law recognizes that a guilty verdict can be based entirely on circumstantial evidence, *see United States v. MacPherson,* 424 F.3d 183 (2d Cir. Sept. 13, 2005); *United States v. Morgan,* 385 F.3d 196, 204 (2d Cir.2004), and that elements going to the operation of a defendant's mind, such as willfulness, can often be proved only through circumstantial evidence, *see United States v. Salameh,* 152 F.3d 88, 143 (2d Cir.1998); *United States v. Nersesian,* 824 F.2d 1294, 1314 (2d Cir. 1987); *see also United States v. Crowley,* 318 F.3d 401, 409 (2d Cir.2003) (recognizing *mens rea* issues as "especially suited for resolution by a trial jury").

Moreover, a reviewing court must examine the evidence in the light most favorable to the government and credit every reasonable inference that the jury could have drawn in its favor. *See, e.g., United States v. Walker,* 191 F.3d 326, 333 (2d Cir.1999). The fact that inferences favorable to the defense could also be drawn from the evidence is of no import because "the task of choosing among competing inferences is for the jury, not a reviewing court." *United States v. Salmonese,* 352 F.3d 608, 618 (2d Cir.2003) (internal quotation marks omitted); *see United States v. Jackson,* 335 F.3d 170, 180 (2d Cir.2003) (noting that court may not substitute its own judgment for that of the jury in evaluating the weight of the evidence and the reasonable inferences to be drawn therefrom). To enter a judgment of acquittal, a court must conclude that the evidence, viewed as a whole and in the light most favorable to the government "is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Guadagna,* 183 F.3d 122, 130 (2d Cir.1999) (internal quotation marks omitted).

In concluding that this is such a case, the majority relies, in part, on *United States v. Glenn,* which states that, when evidence "gives 'equal or nearly equal circumstantial support to a theory of guilty and a theory of innocence,' ... 'a reasonable jury must necessarily entertain a reasonable doubt.'" 312 F.3d 58, 70 (2d Cir. 2002) (quoting *United States v. Lopez,* 74 F.3d 575, 577 (5th Cir.1996)). *Glenn* did not, however, abrogate the holding in *United States v. Autuori* that, when "either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible[, a reviewing court] must let the jury decide the matter." 212 F.3d 105, 114 (2d Cir.

2000); *accord United States v. MacPher-son*, 424 F.3d at 190 (quoting *Autuori*); *United States v. Morgan*, 385 F.3d at 204 (same); *United States v. Espaillet*, 380 F.3d 713, 718 (2d Cir.2004) (same).

In any event, as *Glenn* makes clear, the rule it articulates comes into play only at the end of the review process, that is, after a court has examined the totality of the evidence and drawn all permissible inferences therefrom in favor of the government. *See United States v. Glenn*, 312 F.3d at 70. *Glenn* does not hold that a reviewing court may examine discrete evidence and reject or discount permissible inferences favorable to the government because inferences favorable to the defense could "equally or nearly equally" be drawn from that evidence. *Cf. United States v. Salmonese*, 352 F.3d at 618; *see also United States v. Jackson* 335 F.3d at 180. Thus, unless a court determines that no rational jury could draw an inference favorable to the government from particular evidence, the court must assume that such an inference was drawn. And if the totality of the evidence, including all permissible inferences favorable to the government, would allow a rational jury to find the elements of the charged crime proved beyond a reasonable doubt, the court cannot set aside a guilty verdict.

b. *The Trial Evidence of Willfulness*

Unlike my colleagues in the majority, I conclude that the totality of the evidence would permit a rational jury to find willfulness in this case beyond a reasonable doubt.

(1) *Cassese's Background*

The evidence indicated that Cassese was a sophisticated investor, who traded regularly through seven active brokerage accounts. More important, he was the chief executive officer of a publicly traded corporation, Computer Horizons Corporation. From these background facts, a rational jury could reasonably infer that Cassese possessed, at least, a general awareness that trading on nonpublic information, while not absolutely proscribed, is, nevertheless, strictly regulated.[1] *See United States v. Peltz*, 433 F.2d 48, 52 (2d Cir. 1970) (noting SEC's zealous policing of insider trading); *see also United States v. Dixon*, 536 F.2d 1388, 1395 (2d Cir.1976) (recognizing that chief executive of a publicly traded corporation can be presumed to know that public filings are highly regulated); *United States v. Simon*, 85 F.3d 906, 911 (2d Cir.1996) (noting that licensed stockbroker could be presumed to be familiar with currency filing requirements).

(2) *The Confidentiality Agreement Warning*

Further, the evidence showed that Cassese was specifically warned that trading on nonpublic information relating to a corporate acquisition was unlawful. On May 4, 1999, only six weeks before the challenged purchases, Compuware sent Cassese a Confidentiality Agreement along with a Letter of Intent proposing to acquire Computer Horizons. The Confidentiality Agreement stated: "[T]he United States securities laws prohibit any person in possession of material non-public information about a company from purchasing or selling securities of such company." Confidentiality Agreement at 3. This warning is extraordinarily broad, reaching beyond the parties' specific negotiations and even beyond the trading restrictions of Rules 10b–5 and 14e–3(a). A jury could reasonably

---

1. Cassese has never disputed that he knew he possessed nonpublic information about Compuware's acquisition agreement with DPRC, or that he traded on that information to avail himself of the resulting opportunity to profit in advance of the market.

infer from Cassese's receipt of this warning that his subsequent reliance on non-public information in purchasing DPRC stock was willful, that is, done with an awareness that his actions were unlawful under the securities laws.

The majority concludes otherwise because it finds "no evidence in the record" that could support an inference that Cassese read the Confidentiality Agreement. I cannot agree. Whether a jury can infer that a person has read or is familiar with the contents of a document depends on the totality of the circumstances. *See United States v. Brodie,* 403 F.3d 123, 156–57 (3d Cir.2005) (concluding that jury could reasonably infer defendant's familiarity with contents of a memorandum that noted, on its face, that he had been sent a copy); *see generally United States v. Soto,* 47 F.3d 546, 550 (2d Cir.1995) (recognizing that totality of circumstances must be considered in determining permissible inferences).

In this case, the Confidentiality Agreement and the accompanying Letter of Intent were sent directly to Cassese, and his receipt is undisputed. Moreover, the documents were not unsolicited junk mail or routine corporate memoranda that a busy chief executive might ignore. Rather, the transmittals related to an important business matter—the acquisition of Computer Horizons—in which Cassese had already been playing an active part and in which he had a significant personal interest.[2] Further, there was direct evidence that Cassese had read the accompanying Letter of Intent: Barry Goldsmith testified that Cassese discussed its contents with him the day after its receipt. Trial Tr. at 186–87. From the totality of the circum-

stances, a rational jury could reasonably conclude that Cassese had, in fact, reviewed the Confidentiality Agreement, such that, when he made the charged DPRC purchases, he did so understanding that it was unlawful to trade on nonpublic acquisition information.

### (3) *The Effort to Undo the DPRC Trades*

While I think Cassese's receipt of the Confidentiality Agreement warning would, by itself, permit a rational jury to find willfulness, further evidentiary support was provided by Cassese's subsequent attempt to undo his DPRC trades despite their obvious profitability.[3] The majority concludes that this evidence supports, at most, an inference that Cassese was aware of the unlawfulness of his trades at the time he sought to undo them, not at the time he made the initial purchases. I must disagree.

The majority's analysis relies on cases holding that circumstantial evidence of consciousness of guilt—notably false exculpatory statements and flight—cannot alone support guilty verdicts. There must be some further evidence adduced indicating the defendant's commission of the charged criminal acts. *See United States v. Glenn,* 312 F.3d at 69; *United States v. Scheibel,* 870 F.2d 818, 822 (2d Cir.1989); *United States v. Johnson,* 513 F.2d 819, 824 (2d Cir.1975). True enough. But these cases do not hold that, if such *actus reus* evidence is adduced, there is some temporal limit on the jury's consideration of consciousness-of-guilt evidence to establish *mens rea.* Indeed, if flight or false exculpatory statements were indicative only of a

---

2. If Compuware had acquired Computer Horizons under the terms proposed in the Letter of Intent, Cassese would have realized a personal gain in excess of $33 million.

3. Cassese earned a two-day profit of approximately $149,000 from his purchases and sales of DPRC stock.

defendant's knowledge and intent at the time of those actions, the evidence would be irrelevant to the charged crime and properly excluded. Instead, the law admits consciousness-of-guilt evidence precisely because a jury may properly infer therefrom that the defendant believes himself to be guilty of the charged crime, which constitutes some evidence that he is, in fact, guilty. *See* 1 Leonard B. Sand, et al., *Modern Federal Jury Instructions: Criminal,* Instructions 6–9 (flight), 6–11 (false exculpatory statements) (2002). So in this case, in which other evidence plainly established that Cassese had placed the charged DPRC stock purchases, a rational jury could reasonably infer from his effort to undo those trades that he believed that he was guilty of the charged Rule 14e–3(a) crime, that is, that he believed that, at the time he placed the trades, he did so in willful violation of federal securities laws. *See United States v. Gordon,* 987 F.2d 902, 906–07 (2d Cir.1993) (holding that defendant's knowledge of and intent to participate in a criminal conspiracy may be established through circumstantial evidence, "includ[ing] acts that exhibit a consciousness of guilt"); *see also United States v. Perez,* 387 F.3d 201, 209 (2d Cir.2004) (recognizing that defendant's attempt to persuade a witness to make false exculpatory statements is probative of guilty knowledge and intent).

### (4) *The Admissions to Goldsmith*

Still further proof of Cassese's willfulness was provided by Barry Goldsmith's trial testimony. It is apparent, even on a cold record, that Goldsmith was a reluctant witness. Nevertheless, he testified that, after he alerted Cassese to the appearance of his DPRC trades in letter from the National Association of Securities Dealers, Cassese acknowledged making a "stupid mistake" in purchasing those shares. Trial Tr. at 207–08. Goldsmith also testified

that, from the context of this conversation, he had understood Cassese to mean "[t]hat he bought stock in a company that he should not have done." *Id.* at 255; *see* Fed.R.Evid. 701 (permitting lay opinion testimony); *see also United States v. Garcia,* 413 F.3d 201, 212 (2005) (observing that lay opinion testimony assists the jury by affording it "an insight into an event that was uniquely available" to a direct participant).

Goldsmith's testimony indicates that Cassese realized his "mistake" when he purchased the DPRC shares, not merely after the fact. Goldsmith stated that Cassese told him he had purchased the DPRC shares because he was angry about Compuware's failure to pursue acquisition of Computer Horizons.

Q: Without getting into your assumptions, did Mr. Cassese say anything else about the purchase of DPRC shares?

A: He related that he was either upset or angry . . . .

. . .

CXQ: [D]id he say to you in words or substance that the reason he bought the DPRC stock on June 22nd was that he was upset about the Compuware-[Computer Horizon] deal not going through?

A: Again, I don't recall the specific words, but that was the impression that I got when I talked to him.

Trial Tr. at 207–08.

Viewing this testimony in the light most favorable to the government, I cannot agree with the majority that Goldsmith did not know what Cassese was upset about, nor with the district court that his testimony did little to prove the government's theory of motive, *see United States v. Cassese,* 290 F.Supp.2d at 457. A rational jury could infer from this testimony that Cassese had volunteered his motive to Goldsmith: he had bought the DPRC

stock not because he was looking to diversify his portfolio, but because he was upset about the failure of his own deal with Compuware. As the majority observes, it is not illegal to buy stock because one is upset or angry. But when, as in this case, the upset purchaser (1) knows he is trading on nonpublic information; (2) knows from his business experience that such trading is strictly policed; (3) has been warned (by a Confidentiality Agreement) that *any* trading on nonpublic acquisition information is unlawful; (4) subsequently attempts to undo his charged stock purchases; and (5) admits that these purchases were a "stupid mistake," so that his listener understands him to mean that "he bought stock in a company that he should not have done," I conclude that a rational jury could find beyond a reasonable doubt that the purchaser willfully violated federal securities law.[4]

Accordingly, I respectfully dissent from the majority's decision to affirm the judgment of acquittal on the ground that the government failed to adduce sufficient evidence to prove willfulness.

4. The government submits that Cassese's willful violation of federal securities law was further evidenced by his use of two brokerage accounts to place his DPRC trades. If the dual purchases were to be viewed in isolation, I might agree with the majority that the inference of concealment to be drawn therefrom is too weak to support a finding of willfulness beyond a reasonable doubt. But the evidence does not stand alone and, therefore, I cannot conclude, as a matter of law, that a reasonable jury, in considering these somewhat atypical trades together with the totality of the other evidence indicating willfulness, could not give the dual trades some weight in finding willfulness.

5. The district court had not charged the jury that it was necessary to find that Cassese knew or had reason to know that the nonpublic information related to a tender offer, either to prove a Rule 14e–3(a) violation generally or to prove the willfulness element of Section 32(a) of the Exchange Act. *See* 15

### 2. The District Court's Alternative View of Willfulness

In a post-verdict ruling, the district court concluded that willfulness, for purposes of a criminal Rule 14e–3(a) violation, required the government to prove more than Cassese's awareness of the general unlawfulness of his stock purchases; it required proof that he knew that the nonpublic information at issue related to a tender offer. *See United States v. Cassese*, 290 F.Supp.2d at 450.[5] If such "relationship knowledge" were in fact required to support Cassese's conviction, the government's conceded failure to adduce evidence on this point could provide an alternative ground for affirming the judgment of acquittal in this case. Accordingly, I briefly explain why I do not agree with the district court's construction of willfulness.

### a. The Established Precedents as to Willfulness

This court's decisions in *United States v. Peltz*, 433 F.2d 48, and *United States v.*

U.S.C. § 78ff(a). With respect to the relationship element of Rule 14e–3(a), the district court charged simply that the government was required to prove that at the time Cassese purchased DPRC shares, "the defendant was in possession of material nonpublic information relating to the tender offer for DPRC." Trial Tr. at 523. As to willfulness, the court instructed:

> [T]he government must prove that Mr. Cassese acted intentionally and deliberately with the intent to do something that the law forbids; that is, with a bad purpose to disobey or disregard the law.
> . . .
> Mr. Cassese need not have known that he was breaking any particular law or any particular rule. He need only have been aware of the unlawful nature of his acts. It is the theory of the defense that he did not have this requisite intent.

*Id.* at 528–29.

*Dixon,* 536 F.2d 1388, both authored by Judge Friendly, stand as established precedent that the only proof of knowledge required to establish a willful violation of the Exchange Act is the defendant's awareness of the general unlawfulness of his conduct. *Peltz* holds that willfulness is established by proof simply that the defendant knew that "he was doing a wrongful act," provided the "knowingly wrongful act involve[d] a significant risk of effecting the violation that ... occurred." 433 F.2d at 55. *Dixon* reiterates this exact construction of willfulness. 536 F.2d at 1395. In both cases, Judge Friendly observed that it had been recognized from the time of the Exchange Act's enactment that no stricter standard of willfulness was necessary to support a criminal conviction under federal securities law. *See Peltz,* 433 F.2d at 55 (citing William B. Herlands, *Criminal Law Aspects of the Securities Exchange Act of 1934,* 21 Va. L.Rev. 139, 149 (1934)); *accord Dixon,* 536 F.2d at 1395. Both cases emphasize that "[a] person can willfully violate an SEC rule even if he does not know of its existence." *Dixon,* 536 F.2d at 1395 (quoting *Peltz,* 433 F.2d at 54) (internal quotation marks omitted). The fact that a defendant can avoid incarceration "if he proves that he had no knowledge of" the particular rule at issue was cited as a further ground for not requiring a stricter standard of willfulness. *Peltz,* 433 F.2d at 54 (discussing 15 U.S.C. § 78ff(a)); *accord Dixon,* 536 F.2d at 1395 (same).

In this case, there is no question that Cassese's charged stock purchases presented a significant risk of effecting a Rule 14e–3(a) violation. Thus, *Peltz* and *Dixon* instruct that willfulness required that the government prove only Cassese's awareness of the general unlawfulness of his conduct. It was not required to prove further that Cassese knew that the non-

public information on which he traded related to a tender offer.

b. *The Knowledge Elements of Rule 14e–3(a)*

A second ground for rejecting the district court's construction of willfulness is that it impermissibly expands the knowledge elements specified in Rule 14e–3(a). That rule states, in pertinent part:

> If any person has taken a substantial step or steps to commence, or has commenced a tender offer ("the offering person"), it shall constitute a fraudulent, deceptive or manipulative act or practice within the meaning of section 14(e) of the Act for any other person who is in possession of material information relating to such tender offer which information he *knows or has reason to know* is nonpublic and which he *knows or has reason to know* has been acquired directly or indirectly from:
>
> (1) The Offering person,
>
> (2) The issuer of the securities sought or to be sought by such tender offer, or
>
> (3) Any officer, director, partner or employee or any other person acting on behalf of the offering person or such issuer,
>
> to purchase or sell or cause to be purchased or sold any of such securities or any securities convertible into or exchangeable for any such securities ... unless within a reasonable time prior to any purchase or sale such information and its source are publicly disclosed.

17 C.F.R. § 240.14e–3(a) (emphasis added); *see United States v. O'Hagan,* 521 U.S. 642, 666–77, 117 S.Ct. 2199 (1997) (holding that Rule 14e–3(a) does not exceed SEC's rulemaking authority); *see United States v. Chestman,* 947 F.2d 551, 558 (2d Cir.1991) (*en banc* ) (upholding

SEC authority under Section 14e "to define fraud flexibly in the context of the discrete and highly sensitive area of tender offers").

As the highlighted language indicates, the rule employs two knowledge requirements to identify the traders who fall within its ambit: a trader must (1) know or have reason to know that he is in possession of nonpublic information, and (2) know or have reason to know that he acquired that information, directly or indirectly, from a person involved in a tender offer.[6] No such knowledge requirement attaches to the rule's relationship clause. Thus, while the government is obliged to prove the *fact* of a relationship between the nonpublic information at issue and a tender offer, it is not required to prove the defendant's knowledge of that relationship.

This construction comports with the SEC explanatory release issued the same day that Rule 14e–3 was announced. *See* Tender Offers, Exchange Act Release No. 17120, 1980 WL 20869 (Sept. 4, 1980) ["SEC Release"]. In that release, the SEC identifies the four elements necessary to establish a violation (civil or criminal) of Rule 14e–3(a): The information upon which a defendant trades "(1) must be material, (2) must relate to a tender offer, (3) must be nonpublic and (4) must have been acquired directly or indirectly from the offering person, from the issuer or from another specified person." SEC Release, at *6. In addressing the government's knowledge burden with respect to these elements, the SEC states: "[F]or the last two requisites, there is a 'knows or has reason to know' standard by the person who has the possession of the information. For the first two requisites, i.e., materiality and relation to a tender offer,

there is no 'knows or has reason to know' standard." *Id.*

An agency's interpretation of its own rules is generally accorded considerable deference. *See Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965) (noting particular deference due agency's construction of administrative regulation); *see also United States v. O'Hagan,* 521 U.S. at 673–74, 117 S.Ct. 2199 (noting that "[b]ecause Congress has authorized the Commission, in § 14(e), to prescribe legislative rules, we owe the Commission's judgment more than mere deference or weight" (internal quotation marks omitted)). Thus, as the government correctly observes, courts have consistently construed Rule 14e–3(a) not to require proof of a defendant's knowledge that the nonpublic information at issue related or even likely related to a tender offer. *See, e.g., United States SEC v. Ginsburg,* 362 F.3d 1292, 1304 (11th Cir.2004) (holding that "Rule 14e–3, by its terms, does not require that the offender know or have reason to know that the information relates to a tender offer"); *SEC v. Sargent,* 229 F.3d 68, 78 (1st Cir.2000) ("There is simply no language in the Rule indicating that a defendant must know the nonpublic information in his possession relates to a tender offer."); *see also United States v. Chestman,* 88 Cr. 455(JMW) (S.D.N.Y.1988) (charging jury that "[i]t is not necessary that you find that the defendant knew that the information related to a tender offer, as long as the information did, in fact, relate to a tender offer"), *aff'd,* 947 F.2d 551 (not addressing jury charge).

Because the language of Rule 14e–3(a) does not support, and the SEC's interpretative release specifically rejects, a construction of the rule that would require

---

**6.** Unlike Rule 10b–5, Rule 14e–3(a) applies "without regard to whether the trader owes a pre-existing fiduciary duty to respect the con-

fidentiality of the information." *United States v. Chestman,* 947 F.2d at 557.

proof of a relationship-knowledge element, a court cannot, in essence, rewrite the rule by adding a relationship-knowledge requirement to the willfulness element of a criminal charge.

### c. The District Court's Stated Ground for a Stricter Construction of Willfulness

Finally, the district court's stated reason for requiring proof of relationship knowledge as an aspect of willfulness is unconvincing. The district court concluded that relationship knowledge was essential to prove willfulness to ensure that Rule 14e–3(a) does not "impose absolute liability for all who trade on material nonpublic information" relating to tender offers. *United States v. Cassese*, 290 F.Supp.2d at 451. In *United States v. O'Hagan*, the Supreme Court observed that the federal securities laws do not impose any "general duty between all participants in market transactions to forgo [trading] based on material, nonpublic information." 521 U.S. at 661, 117 S.Ct. 2199 (internal quotation marks omitted). No absolute liability concern arises with respect to Rule 14e–3(a), however, because its source-knowledge element limits liability to persons who trade on nonpublic information that they know or have reason to know was acquired from a person involved in a tender offer.

In its brief to this court, the government appears to construe this source-knowledge element as requiring proof only that Compuware was an offering person and that Cassese knew that he had acquired nonpublic information from Compuware.[7] It might fairly be questioned whether this accurately states the government's burden,

or whether the government was required to prove that Cassese knew or had reason to know that Compuware was an offering person for DPRC when he placed the charged trades. It is unnecessary to pursue the question of the source-knowledge burden further in this dissent, however, because the majority affirms the judgment of acquittal on other grounds. I note simply that, if a court were to conclude that the government's construction of the source-knowledge element raised any absolute liability concerns about Rule 14e–3(a), those concerns would appropriately be addressed by more narrowly construing the source-knowledge element that the SEC recognizes, rather than by injecting into the element of willfulness a relationship-knowledge requirement that the SEC has specifically disavowed.

To summarize, because I conclude that the only knowledge the government was required to prove to establish willfulness was Cassese's awareness of the general unlawfulness of his stock purchases, and because I conclude that a rational jury could have found such knowledge beyond a reasonable doubt, I dissent from the decision to affirm the district court's judgment of acquittal.

---

**7.** The district court's charge to the jury was consistent with this theory as to the source-knowledge burden, instructing that the government was required to prove "that the defendant knew that the information had been disclosed to him by Compuware or from an officer, director, employee or other person acting on behalf of Compuware." Trial Tr. at 524.