18-3065
*United States v. Kosinski*

# United States Court of Appeals
# for the Second Circuit

AUGUST TERM 2019

No. 18-3065

UNITED STATES OF AMERICA,
*Appellee,*

*v.*

EDWARD J. KOSINSKI,
*Appellant.*

On Appeal from the United States District Court
for the District of Connecticut
Vanessa L. Bryant, *Judge.*

ARGUED: OCTOBER 30, 2019
DECIDED: SEPTEMBER 22, 2020

Before: CABRANES and RAGGI, *Circuit Judges*, and KORMAN, *District Judge.*[*]

---

[*] Judge Edward R. Korman, United States District Judge for the Eastern District of New York, sitting by designation.

1

Dr. Edward Kosinski served as a principal investigator for a clinical trial of a cardiac drug designed to prevent blood clotting. After he learned that patients suffered adverse effects during the trial, Kosinski traded on that nonpublic inside information to avoid a loss and earn a profit in the shares of the pharmaceutical company for which he was principal investigator. He was convicted of two counts of insider trading in violation of Section 10(b) of the Securities Exchange Act of 1934, and Rule 10b–5 promulgated thereunder, in the United States District Court for the District of Connecticut (Bryant, *J.*) and was sentenced principally to six months' incarceration. On appeal, Kosinski argues primarily that he was under no duty to refrain from trading based on nonpublic inside information, and that there was insufficient evidence that he committed a willful violation of the law. We conclude that Kosinski did have a duty to refrain from trading on nonpublic inside information and that the evidence was sufficient to convict Kosinski. We further conclude that the trial judge's jury instructions and evidentiary rulings contained no reversible error.

AFFIRMED.

ALEXANDRA A.E. SHAPIRO (Philip W. Young, *on the brief*), Shapiro Arato Bach LLP, New York, New York, *for Defendant-Appellant.*

HEATHER L. CHERRY, Assistant United States Attorney (Jonathan N. Francis and Sandra S. Glover, *on the brief*) *for* John H. Durham, United States Attorney for the District of Connecticut, New Haven, Connecticut, *Appellee.*

KORMAN, *District Judge*:

Dr. Edward Kosinski was a principal investigator in a clinical trial (the "Study") for a heart-related drug developed by Regado Biosciences, Inc. ("Regado"), a publicly traded biopharmaceutical company whose stock was traded on NASDAQ. Regado's pharmaceutical product was designed to prevent blood clotting in patients undergoing heart procedures. As a principal investigator in the Study, Kosinski was responsible for recruiting the subjects, determining their suitability, monitoring their tolerance and reaction and reporting the results. To that end, he persuaded twenty patients who were part of his practice to participate in the Study, for which Regado paid Kosinski a fee of $80,000. Further, Kosinski was responsible for "making sure that the patients understand the risks and the reason why they're being enrolled, and getting informed consent and then making sure that they're getting the best level of care and following . . . good clinical practice." Gov't App'x at 547.

During the course of the Study, Kosinski, who was also a sophisticated stock trader with a portfolio exceeding $11 million, secretly accumulated

3

approximately $250,000 of Regado stock in breach of his agreement to disclose if his holdings exceeded $50,000. Then, after being advised by Regado of information likely to affect the trial adversely, Kosinski traded based on that nonpublic inside information.

First, Kosinski sold Regado stock when he was informed the Study would be suspended due to safety concerns, avoiding a loss of $160,000 at the expense of purchasers who did not have access to the same nonpublic inside information. Then, when informed that a patient had died and that the Study would be suspended indefinitely, Kosinski bet against Regado's stock by purchasing put options from which he realized a net profit of $3,300 when Regado publicly announced that it had permanently terminated the clinical trial. Kosinski later admitted to the FBI that these trades were based on "greed and stupidity" and that "he didn't feel good about making those trades when he had made them." His indictment, trial, and conviction for violating Section 10(b) of the Securities Exchange Act of 1934 resulted, and he was sentenced principally to six months' imprisonment and a $500,000 fine. Kosinski is free on bail pending this appeal.

4

On appeal, Kosinski challenges the sufficiency of the evidence presented at trial, as well as certain of the district court's jury instructions and evidentiary rulings. Because Kosinski raises a sufficiency challenge, we "view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *United States v. Martoma*, 894 F.3d 64, 72 (2d Cir. 2017); *see also Jackson v. Virginia*, 443 U.S. 307, 319 (1979) ("upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution"). Moreover, to the extent he challenges the district court's legal conclusions, our review is *de novo. United States v. Castello*, 611 F.3d 116, 119 (2d Cir. 2010).

## BACKGROUND

In 2005, Regado commenced a clinical trial of its cardiac drug, known as REG1 Anticoagulation System ("REG1"), to test whether it could safely and effectively reduce the incidence of heart attacks, strokes, and deaths in patients undergoing angioplasty procedures to unblock clogged arteries.

5

Clinical drug trials involve multiple phases. Before human trials begin, researchers ordinarily test the drug in animals. Then, phase one analyzes whether the drug is safe in humans. Phase two studies a larger patient population, examining both safety and efficacy. If these two phases succeed, the drug company, which is the "sponsor," conducts phase three, a comprehensive study of thousands of patients at hundreds of study sites. If phase three is successful, the sponsor can seek final Food and Drug Administration ("FDA") approval to market the drug. Kosinski only participated in the third phase of the REG1 trial at a single site, although the Study involved a large, heterogenous population of patients at multiple sites.

For phase three, Regado hired the Cleveland Clinic Foundation, which supports research into cardiovascular drugs, to help write the Study protocol and administer the Study by choosing sites and principal investigators as well as by handling communication, site contract negotiation and execution, and payment for services.

On June 12, 2013, the Cleveland Clinic Foundation, on behalf of Regado, and the Connecticut Clinical Research, LLC (the "LLC"), of which Kosinski was president and through which he conducted multiple clinical trials for various drugs, entered into a Confidential Disclosure Agreement (the "CDA") to determine whether Kosinski would serve as a principal investigator for the Study. Kosinski signed the CDA on behalf of the LLC. The CDA allowed employees of the LLC to receive confidential information from Regado—such as the Study's protocol—which provided information subject to a restriction on disclosure and use.

On January 22, 2014, the Cleveland Clinic Foundation, on behalf of Regado, and the LLC, with Kosinski signing as president, entered into a superseding contract called a Clinical Study and Research Agreement ("CSRA"), pursuant to which Kosinski became a principal investigator for one of the many sites of phase three of the Study. Kosinski again signed the CSRA as the LLC's president. He also acknowledged and agreed to the CSRA in his personal capacity as the principal investigator.

The CSRA included two key interrelated provisions that are particularly relevant to this appeal: Kosinski was required (1) to maintain in "strict confidence" all the information with which he was provided to enable him to perform as principal investigator; and (2) to complete a financial disclosure form called a Form FDA 1572, which in turn required that he "promptly" disclose to Regado if the value of his Regado stock exceeded $50,000. The form stated that such disclosure would be "of concern to [the] FDA."

This disclosure form was intended to safeguard against potential conflict of interest by those involved in clinical trials. Federal regulations state that a "potential source of bias . . . is a financial interest of the clinical investigator in the outcome of the study," which includes "an equity interest in the sponsor of the covered study." 21 C.F.R. § 54.1(b). The required stockholding disclosure would thus allow sponsors such as Regado to identify if principal investigators had a conflict, which could not only endanger patient safety but also possibly delay or interfere with the FDA's approval process.

8

Sponsors, such as Regado, are motivated to obtain FDA approval for their product, along with the attendant financial rewards. That financial interest is the motivation for the sponsor vesting responsibility for a clinical trial in principal investigators, with whom the sponsor does not have direct contact but with whom the sponsor works through intermediaries like the Cleveland Clinic Foundation. Likewise, it is the reason for requiring the sponsor to disclose to the FDA any financial entanglements between itself and the principal investigator, along with any steps it had taken to minimize the risk of bias. *See* 21 C.F.R. § 54.4(a). As a Cleveland Clinic Foundation executive testified at trial, these conflict-avoiding practices and the related FDA regulations principally address the concern that "[i]f there's a safety issue, [conflicted study participants] may not report it if [they] think it's going to negatively impact the trial. That would be a very big concern actually for patient safety. Or, you know, anything else that [persons] may— [persons] may sway the trial to go the way [they] want it to go if [they] have a financial interest." Gov't App'x at 72–73; *see* 45 C.F.R. § 46.101 et seq.

9

## I.      Kosinski's Trading And Related Representations

Kosinski began purchasing Regado shares on October 8, 2013, four months after entering into the CDA in June 2013, acquiring 2,000 Regado shares that day, and 2,000 more the next day. On October 16, 2013, he executed an application to St. Vincent's Medical Center in Bridgeport, Connecticut, for permission to administer Regado's drug to patients there for purpose of the Study. In that application, he falsely represented that he did not own any Regado shares.

In February 2014, shortly after the LLC had entered into the CSRA, Kosinski bought another 2,000 Regado shares, and by the end of that month, he owned well over $50,000 of Regado stock, triggering his obligation to "promptly" disclose that fact to Regado, which he failed to do. In April and May of 2014, Kosinski bought an additional 31,000 Regado shares, bringing the total value of his holdings to around $250,000. During these months, Kosinski failed to make the required disclosure to Regado. As far as Regado knew, the value of Kosinski's interest never exceeded $50,000.

On Sunday, June 29, 2014, while the Study was underway, Kosinski received an email from the Study's management team.[1] The email alerted all principal investigators that the enrollment of new patients was being put on hold until Wednesday, July 2, 2014 because there had been "several allergic reactions over the past few weeks, and the [data safety monitoring board] and trial leadership need time to review the recent events thoroughly." On Monday, June 30, 2014, the morning after he received the email and before the information contained therein was made public, Kosinski sold all of his Regado shares. Thereafter, on Wednesday, July 2, 2014, Regado issued a press release announcing that it was suspending the Study due to "serious adverse events related to allergic reactions," and Regado's stock price fell approximately 58% the next day. If Kosinski had not sold all of his shares beforehand, their value would have been diminished by around $160,000.

---

[1] The management team performs the high-level decision-making regarding trial structure and safety and includes representatives from Regado as the sponsor and from the Cleveland Clinic Foundation as the trial administrator, as well as a data safety monitoring board, which is responsible for advising the sponsor on patient safety-related issues.

On Tuesday, July 29, 2014, Kosinski received another email from the trial management team to all of the principal investigators. This email revealed that a patient at another Study site had died from an allergic reaction to the drug, and that the Study was on hold pending an assessment by the Study's data safety management board. Two days later, before the patient's death was made public, Kosinski placed a bet that Regado's share price would fall: He bought 50 put options that collectively would entitle him to sell up to 5,000 Regado shares for $2.50 each by October 18, 2014. On August 25, 2014, Regado issued a press release announcing that the trial was being permanently halted due to the frequency and severity of allergic reactions. That same day, Regado's share value dropped from around $2.80 to around $1.10. On August 28, 2014, Kosinski bought 5,000 Regado shares for around $1.10 each and then used his put options to sell the same number of shares for $2.50 each. Kosinski's net profits from these transactions was around $3,300.[2]

___

[2] Kosinski's net profit was less than the difference between the value of the 5,000 shares he purchased on August 28, 2014, and the price for which he

12

On September 29, 2014, a month after the Study was terminated, the Cleveland Clinic Foundation sent Kosinski a letter that, among other things, offered a "reminder" that "[i]f any investigator has any relevant financial interest changes related to Regado Biosciences for 1 year following termination of the study, please send updated Financial Disclosure Forms to Regado." In response to this letter, on October 1, 2014, after the Study terminated and when he no longer held any stock in Regado, Kosinski executed a Form FDA 1572, as he was required to do under the CSRA. That was the first FDA Form 1572 that Kosinski had filed since the initial one he filed in December 2013 when he executed the CSRA on behalf of the LLC, notwithstanding his obligation to "promptly" update the form when the value of his Regado shares rose above $50,000, which occurred in February 2014.

---

sold them because Kosinski paid a $0.70 premium for each share the put options entitled him to sell.

## II.   <u>Kosinski's Statements to the FBI</u>

James McGoey, an FBI agent, interviewed Kosinski in person for nearly an hour and a half in June 2016.  Agent McGoey also called Kosinski on the telephone in August 2016.  During that call, which lasted about five minutes, McGoey told Kosinski that he had been indicted for securities fraud.  McGoey testified that Kosinski told him that it was a "stupid thing that he did and he didn't feel good about making those trades when he had made them," and that Kosinski used the words "greed and stupidity" to describe what caused him to make those trades.[3]

## ANALYSIS

Kosinski was tried and convicted of two counts of violating § 10b of the Securities Exchange Act and Rule 10b–5.  One count was based on the sale of all his shares shortly after receiving the June 2014 email announcing the Study's suspension, and the other count was based on his purchase of 50 put options shortly after learning the Study would be canceled.

---

[3] As discussed *infra* at 52, Kosinski also told McGoey that he "can't believe this is happening" and that he had not retained counsel.  Gov't App'x at 668.

Kosinski challenges these convictions, arguing principally that the evidence was legally insufficient to prove that he breached a duty owed to Regado and that the district court's jury instruction was erroneous. He maintains that he agreed only to keep the information he received in the course of the Study in strict confidence, which he claims he did, and that secretly trading on the basis of information was not a breach of his agreement. Whatever merit Kosinski's argument might have had Regado brought a civil action for breach of contract, it fails in the context of a criminal prosecution for trading on nonpublic inside information that was not available to those upon whom he unloaded his shares without making the requisite disclosure.

Kosinski further challenges his conviction by arguing that the district court gave the jury an improper instruction on willfulness and that, when assessed under the proper standard, the evidence presented at trial was legally insufficient to prove that he acted willfully. Finally, Kosinski challenges several evidentiary rulings.

We address each argument in turn.

15

**I.** **Kosinski Had A Duty To Regado Not To Trade in Regado's Stock Absent Disclosure**

Section 10(b) of the Securities Exchange Act of 1934 prohibits the use of "any manipulative or deceptive device or contrivance" in connection with the purchase or sale of securities. 15 U.S.C. § 78j(b). Similarly, Rule 10b–5 makes it unlawful to "employ any device, scheme, or artifice to defraud, [or] . . . to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5. "In an inside-trading case this fraud derives from the inherent unfairness involved where one takes advantage of information intended to be available only for a corporate purpose and not for the personal benefit of anyone." *Dirks v. SEC*, 463 U.S. 646, 654 (1983) (internal quotation omitted). We conclude that Kosinski owed a duty to Regado not to trade in Regado's stock based on confidential, nonpublic information, absent disclosure to Regado.

## A. Kosinski Owed A Duty to Regado As A "Temporary Insider"

In *United States v. O'Hagan*, Justice Ginsburg succinctly set forth the two theories under which a defendant may be found guilty of insider trading: the classical and misappropriation theories.

> Under the "traditional" or "classical theory" of insider trading liability, § 10(b) and Rule 10b–5 are violated when a corporate insider trades in the securities of his corporation on the basis of material, nonpublic information. Trading on such information qualifies as a "deceptive device" under § 10(b), we have affirmed, because "a relationship of trust and confidence [exists] between the shareholders of a corporation and those insiders who have obtained confidential information by reason of their position with that corporation." *Chiarella v. United States*, 445 U.S. 222, 228 (1980). That relationship, we recognized, "gives rise to a duty to disclose [or to abstain from trading] because of the 'necessity of preventing a corporate insider from . . . tak[ing] unfair advantage of . . . uninformed . . . stockholders.'" *Id*., at 228–229 (citation omitted). The classical theory applies not only to officers, directors, and other permanent insiders of a corporation, but also to attorneys, accountants, consultants, and others who temporarily become fiduciaries of a corporation. *See Dirks v. SEC*, 463 U.S. 646, 655, n. 14 (1983).

> The "misappropriation theory" holds that a person commits fraud "in connection with" a securities transaction, and thereby violates § 10(b) and Rule 10b–5, when he misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information. Under this theory, a fiduciary's undisclosed, self-serving use of a

17

principal's information to purchase or sell securities, in breach of a duty of loyalty and confidentiality, defrauds the principal of the exclusive use of that information. In lieu of premising liability on a fiduciary relationship between company insider and purchaser or seller of the company's stock, the misappropriation theory premises liability on a fiduciary-turned-trader's deception of those who entrusted him with access to confidential information.

521 U.S. 642, 651–52 (1997).

Both theories advance the "animating purpose of the Exchange Act: to insure honest securities markets and thereby promote investor confidence." *Id.* at 658. They are based on the assumption that "investors likely would hesitate to venture their capital in a market where trading based on misappropriated nonpublic information is unchecked by law." *Id*. Both theories seek to avoid the unfairness that "[a]n investor's informational disadvantage vis-à-vis the misappropriator with material, nonpublic information stems from contrivance, not luck; it is a disadvantage that cannot be overcome with research or skill." *Id.* at 658–59. These theories are consistent with the common law principle that "a person who acquires special knowledge or information by virtue of a confidential or fiduciary relationship with another is not free to exploit that knowledge or

information for his own personal benefit[.]" *Diamond v. Oreamuno*, 24 N.Y.2d 494, 497 (1969).

This case was prosecuted under the misappropriation theory. Specifically, as we have held, "a person violates Rule 10b–5 when he misappropriates material nonpublic information in breach of a fiduciary duty or similar relationship of trust and confidence and uses that information in a securities transaction." *United States v. Falcone*, 257 F.3d 226, 230 (2d Cir. 2001) (Sotomayor, *J.*) (internal citation omitted). We have explained that

> a fiduciary relationship, or its functional equivalent, exists only where there is explicit acceptance of a duty of confidentiality or where such acceptance may be implied from a similar relationship of trust and confidence between the parties. Qualifying relationships are marked by the fact that the party in whom confidence is reposed has entered into a relationship in which he or she acts to serve the interests of the party entrusting him or her with such information.

*Id.* at 234–35.

Significantly, a qualifying relationship does not require one to be a traditional corporate insider. The Supreme Court has explained that,

> [u]nder certain circumstances, such as where corporate information is revealed legitimately to an underwriter, accountant, lawyer, or consultant working for the corporation, these outsiders may become fiduciaries of the shareholders. The basis for recognizing this fiduciary duty is not simply that such persons acquired nonpublic corporate information, but rather that they have entered into a special confidential relationship in the conduct of the business of the enterprise and are given access to information solely for corporate purposes.

*Dirks*, 463 U.S. at 655 n.14. We have described such individuals as "temporary insiders." *United States v. Chestman*, 947 F.2d 551, 567 (2d Cir. 1991) (en banc).

While the language in *Dirks* was in the context of the traditional classical theory of insider trading, it likewise encompasses those who have entered into a "special confidential relationship," *Dirks*, 463 U.S. at 655 n.14, that has enabled them to misappropriate information that was "intended to be available only for a corporate purpose and not for the personal benefit of anyone," *id.* at 654 (internal quotation omitted). This court has recognized that the classical and misappropriation theories are "overlapping,"

20

sometimes proscribing the same or similar conduct. *United States v. Newman*, 773 F.3d 438, 445 (2d Cir. 2014), *abrogated on other grounds by Salman v. United States*, 137 S. Ct. 420 (2016). Thus, we have treated the theories as intertwined branches of the same tree, explaining that in both cases, it is the "breach of a fiduciary duty or other duty of loyalty and confidentiality that is a necessary predicate to insider trading liability." *Martoma*, 894 F.3d at 73.[4]

Temporary insiders are therefore forbidden from trading under both the classical and misappropriation theories without the requisite disclosure. Indeed, the only meaningful difference between the two theories is the victim of the fraud. Where, as here, a trader owes a duty to both the shareholders with whom he trades and the source of the confidential information on which he trades, he must make disclosure to both. *See O'Hagan*, 521 U.S. at 655 n.7 (where "a person trading on the basis of

_____

[4] In *Martoma*, we also observed that "[a]lthough many of the cases refer to 'insiders' and 'fiduciary' duties because those cases involve the 'classical theory' of insider trading, the *Dirks* articulation of tipper and tippee liability also applies under the misappropriation theory, where the misappropriator violates some duty owed to the source of the information." *Martoma*, 894 F.3d at 73 n.5.

material, nonpublic information owes a duty of loyalty and confidentiality to two entities or persons . . . but makes disclosure to only one, the trader may still be liable").

Turning to this case, we view Kosinski's role as a principal investigator to fit squarely within *Dirks*'s recognition of "temporary insiders" who play fiduciary-like roles, such that he could have been successfully prosecuted under the classical theory (because he failed to disclose to his trading counterparty that he was trading on inside information) and under the misappropriation theory (because he failed to disclose to Regado that he was trading on inside information that he had been given in confidence). *Chestman*, 947 F.2d at 565 (citing *Dirks*, 463 U.S. at 655 n.14). Kosinski was entrusted with Regado's information solely because of his duty to ensure the integrity and accuracy of the phase three clinical trial, as well as the health of his patients. Regado provided Kosinski the information he traded upon because that information was integrally related to the safety of the Study, ultimately necessitating its termination. Indeed, Kosinski would not have been provided this information absent his "explicit acceptance of a duty of

22

confidentiality." *Falcone*, 257 F.3d at 234. Moreover, Kosinski further agreed to disclose if his holding of Regado stock exceeded $50,000, which presumably would have triggered Regado's closer oversight of Kosinski (or even his termination) given its significance to the FDA, and which he failed to do. Under these circumstances, Kosinski qualified as a temporary insider of Regado.

Since it is uncontested that Kosinski traded on Regado's nonpublic inside information without disclosure to Regado, he therefore "misappropriate[d] confidential information for securities trading purposes, in breach of a duty owed to the source of the information." *O'Hagan*, 521 U.S. at 652. That failure to disclose satisfied the element of deceit required by § 10(b) and Rule 10b–5. *Id.*

## B. Kosinski Had A Fiduciary-Like Relationship With Regado

Separate and apart from whether Kosinski qualified as a "temporary insider" of Regado, we conclude that Kosinski's relationship with Regado was fiduciary in nature because it was a relationship based upon trust and confidence. Kosinski expressly agreed to keep Regado's information

23

confidential. Moreover, Regado entrusted Kosinski with the administration of a newly-created drug to human beings. It was presumably Regado's faith and confidence in Kosinski's reputation as a prominent New England cardiologist, his experience as a principal investigator, and his willingness to provide access to his patients, that caused Regado to secure Kosinski's services. By selecting Kosinski, Regado chose a distinguished physician, knowing that the Study could become a matter of life and death—as indeed it did at another site—because "you're asking patients to put their lives at stake when they participate." Gov't App'x at 310. Kosinski's experience and skill were important to Regado avoiding such an outcome and ultimately to Regado receiving FDA approval for REG1 and the financial reward that would accompany it. Regado accordingly entered into a relationship with Kosinski that was "marked by" his service of "the interests of the party entrusting him [] with such information." *Falcone*, 257 F.3d at 234–35 (internal citation omitted). Thus, Kosinski regularly received information from Regado regarding the drug trial, including the confidential information that he ultimately misappropriated and upon which he traded.

24

Such trading vitiates the principal investigator's critical function, by fixing his attention on his own monetary gain and depriving the company of the independent assessment required for FDA approval. Principal investigators are charged with caring for the well-being of their patients, not the ultimate success of the drug. But by appropriating the sponsor's nonpublic inside information to trade in its stock, a principal investigator's financial interest becomes aligned with the outcome of the study—he has an incentive to lie about or conceal patients' results in order to influence the study's outcome, and ultimately his wallet. When a sponsor such as Regado files an application for the approval of a particular drug, however, it makes representations to the FDA, which in turn the FDA necessarily relies on, about the integrity of the study performed by principal investigators. Allowing principal investigators to trade on the nonpublic inside information entrusted to them in the course of a study would thus undermine that study's integrity, the very reason why principal investigators are vested with independence from the drug's corporate sponsor.

Indeed, as indicated above, the contract creating the relationship between Kosinski and Regado—the CSRA—contained two significant provisions. First, his contract required that the Study information conveyed to Kosinski be held in "strict confidence," which provided Regado with the "trust and confidence" it required to disclose to him critical inside information. *Falcone*, 257 F.3d at 234. Regado would not have provided this information had Kosinski not agreed to keep the information confidential. This court has held that such an "explicit acceptance of a duty of confidentiality" is itself sufficient to establish the necessary fiduciary duty of trust and confidence. *Id.*; *see also Chestman*, 947 F.2d at 571. Second, the contract required Kosinski to inform Regado if the value of his shares in that company exceeded $50,000. This served to ensure that Kosinski's assessment of the drug's safety and efficacy was independent of the company's interest in obtaining FDA approval. Had Kosinski not agreed to make this disclosure, he could not have been hired.

In sum, we conclude that there was sufficient evidence that Kosinski's role as a principal investigator clothed him with fiduciary status such that

26

he could not trade on Regado's nonpublic inside information absent disclosure. *Chestman*, 947 F.2d at 565. That conclusion is only reinforced by Kosinski's agreement to disclose to Regado when the value of his shares exceeded $50,000, which he failed to do. The evidence established that Kosinki's unrevealed investment in Regado created a conflict between his financial interest and his duty to objectively gather and report information about REG1's safety and effectiveness. In these circumstances, his secret trading in Regado stock based on the nonpublic inside information that was disclosed to him because of his relationship of trust and confidence constituted a fraud on Regado.[5]

### C.  Kosinski's Arguments To The Contrary Are Without Merit

In urging otherwise, Kosinski first argues that he did not violate federal securities law because he was simply bound by the provisions of his agreement with Regado not to disclose any confidential information that he

---

[5] Because we hold that the evidence was otherwise sufficient to convict Kosinski, we do not address the application of Rule 10b5–2, upon which the U.S. Attorney relies and which provides that a "duty of trust or confidence" exists "[w]henever a person agrees to maintain information in confidence." 17 C.F.R. § 240.10b5–2(b)(1).

acquired as a result of his involvement as an investigator in the Study, and he did not divulge any such information in breach of the CSRA. But as we have demonstrated, the agreement was significantly broader than Kosinski asserts. The CSRA expressly required that Kosinski complete a financial disclosure form and promptly disclose if the value of his shares of Regado stock exceeded $50,000. Kosinski breached this duty to disclose, which was clearly designed to inform Regado if Kosinski was no longer the independent assessor for whose services Regado contracted. Kosinski's breach of this condition constituted a breach of the confidentiality agreement of which it was an integral part.

Nor does it help Kosinski's cause that the operative CSRA contained a clause providing that Kosinski would "maintain in strict confidence" Regado's confidential information, while the preceding CDA contained a comparable prohibition on disclosure as well as use of confidential information. The Supreme Court has held that a temporary insider's duty not to trade on insider information can arise from an expectation that "the outsider [will] keep the disclosed nonpublic information confidential" and

28

that his relationship with the corporation at a minimum "must imply such a duty." *Dirks*, 463 U.S. at 655 n.14. It follows that the absence of an express prohibition on trading is not fatal here. In any event, we decline to infer Regado's intent to permit Kosinski to trade on nonpublic Study information based on the CSRA's omission of a clause contained in the prior CDA, a conclusion only reinforced by the CSRA's merger clause, which stated expressly that the CSRA embodied the entire understanding of the parties and thus rendered the CDA irrelevant.[6] The same is true of other agreements that Regado may have had with third parties. *See Applied Energetics, Inc. v. NewOak Capital Mkts., LLC*, 645 F.3d 522, 525–26 (2d Cir. 2011).

Similarly, we reject the notion that Kosinski could not have been a fiduciary of Regado because the CSRA labeled him an independent contractor. The Supreme Court has held that independent contractors such as outside attorneys, accountants, underwriters, and consultants can serve

---

[6] The CSRA's merger clause provided that: "This Agreement, including Exhibits A and B, embodies the entire understanding between [the LLC], [St. Vincent's Medical Center], [Kosinski] and [Regado] for [] the subject matter herein, and any prior or contemporaneous negotiations, either oral or written, are hereby superseded." App'x at 243.

as fiduciaries sufficient to establish their insider trading liability. *See Dirks*, 463 U.S. at 655 n.14.

Moreover, we do not afford the contractual term "independent contractor" controlling effect where such a term, even in a private contract, implicates significant public policies. *See Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1059 (2d Cir. 1988) (stating that a "self-serving label of [employees] as independent contractors is not controlling"). Here, in light of the significant public policy considerations "animating" the Exchange Act, *O'Hagan*, 521 U.S. at 658, we would decline to deem controlling language used by private parties that would permit unlawful insider trading. Nor do we find controlling cases between private parties based on a cause of action for breach of fiduciary duty, *see, e.g.*, *Spinelli v. Nat'l Football League*, 903 F.3d 185, 207–08 (2d Cir. 2018). Those cases simply do not implicate any considerations of federal public policy, much less considerations as strong

as those underlying the prohibition against insider trading in the Exchange

Act, as articulated by Justice Ginsburg in *O'Hagan*.[7]

---

[7] We have made a similar point in the context of the Securities Act of 1933. In *Kaiser-Frazer Corp. v. Otis & Co.*, 195 F.2d 838 (2d Cir. 1952), we declined to enforce a contract for sale of securities by Kaiser-Frazer to one of its underwriters, Otis & Co., which claimed that Kaiser-Frazer misleadingly inflated its profits in December 1947. *Id.* at 843–44. The record indicated, however, that representatives of Otis were informed of the actual December earnings and took part in the preparation of the registration statement and prospectus. *Id.* at 843.

We nevertheless declined to apply the ordinary "rules of estoppel or waiver," because whatever those rules "may be in the case of an ordinary contract of sale, nevertheless it is clear that a contract which violates the laws of the United States and contravenes the public policy as expressed in those laws is unenforceable." *Id*. Writing for the panel, Judge Augustus Hand explained that "regardless of the equities as between the parties, [] the very meaning of public policy is the interest of other than the parties and that interest is not to be at the mercy of the [parties] alone." *Id.* at 844 (internal quotation omitted). "While it may be argued that the enforcement of the underwriting contract according to its terms would result only in the sale of the stock to Otis and that such a sale would not violate the [Securities Act of 1933], we are satisfied that the contract was so closely related to the performance of acts forbidden by law as to be itself illegal." *Id*. Similarly here, Kosinski's actions substantially undermined the policies underlying the Exchange Act relating to insider trading. Accordingly, whether or not the language of the contract would have provided a defense to a private breach of contract action by Regado, Kosinski's designation as an independent contractor cannot control the legality of his trades.

We likewise reject the argument that Kosinski could not have been a fiduciary because he dealt with Regado at "arm's-length," a term that is often used but rarely defined. We have held that while "[an arm's length] relationship is not by itself a fiduciary relationship," the "addition of a relationship of confidence [or] trust," as was present here, "may indicate that such a relationship exists." *In re Mid-Island Hosp., Inc.*, 276 F.3d 123, 130 (2d Cir. 2002) (internal quotation omitted); *see also, e.g.*, *Muller-Paisner v. TIAA*, 289 F. App'x 461, 466 (2d Cir. 2008) (summary order) (relying on *In re Mid-Island Hosp.* to explain that "a fiduciary duty may arise in the context of [such] a commercial transaction upon a requisite showing of trust and confidence," as was present here).

We come now to Kosinski's argument that the evidence was insufficient to conclude that he was a fiduciary of Regado on the basis of language in *Chestman* highlighting three particular factors: that "[a]t the heart of the fiduciary relationship lies reliance, and de facto control and dominance." 947 F.2d at 568. "Stated differently, a fiduciary relation exists when confidence is reposed on one side and there is resulting superiority

32

and influence on the other." *AG Cap. Funding Partners v. State St. Bank & Tr. Co.*, 11 N.Y.3d 146, 158 (2008) (quoting *Ne. Gen. Corp. v. Wellington Adv.*, 82 N.Y.2d 158, 173 (1993) (Hancock, *J.*, dissenting)); *see also Fisher v. Bishop*, 108 N.Y. 25, 28 (1888) (fiduciary relationship exists when "there has been a confidence reposed which invests the person trusted with an advantage in treating with the person so confiding").

The evidence was sufficient here to find that Kosinski's relationship with Regado satisfied this standard. As we observed earlier, Regado entrusted Kosinski with the administration of a newly-created drug to human beings because of his experience as a principal investigator who could give Regado access to his patients. His patients' continued participation in the Study presumably was dependent on Kosinski's relationship with them. Thus, while control of REG1 was Regado's at the outset, it ceded that control, at least for purposes of conducting the Study, to principal investigators, such as Kosinski, relying on their superior medical skill and expertise, and affording them dominance in assessing how the drug actually performed for patients. Regado relied upon Kosinski's professional

33

independence and integrity to accurately report back his results about REG1 from the Study, without which information Regado's clinical trial could not be completed. Kosinski's relationship with Regado was therefore "characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise," *SEC v. DiBella*, 587 F.3d 553, 564 (2d Cir. 2009).

We have assumed for purpose of addressing Kosinski's argument that these three factors described in *Chestman* reflect the only appropriate standard from which the jury could find the requisite fiduciary relationship.[8] They do not. We provide the following detailed analysis of *Chestman*—more than would otherwise be necessary—because of the extensive reliance on these factors in Kosinski's briefing.

---

[8] We frame the issue in terms of the sufficiency of the evidence because Kosinski never sought a jury instruction defining a fiduciary relationship to require reliance, de facto control and dominance. Nor does he raise on appeal the adequacy of the charge in this respect, which did not include discussion of these factors. Thus, he is forced to argue that the evidence was insufficient as a matter of law.

*Chestman*'s reference to "reliance, and de facto control and dominance" was a direct quotation from *United States v. Margiotta*, 688 F.2d 108 (2d Cir. 1982), which concerned the federal mail fraud statute and relied on New York law. It is helpful to place that language in the context of the analysis prompting its adoption. As framed by Judge Kaufman, writing for the majority, *Margiotta* raised "the novel issue whether an individual who occupies no official public office but nonetheless participates substantially in the operation of government owes a fiduciary duty to the general citizenry not to deprive it of certain intangible political rights that may lay the basis for a mail fraud prosecution." 688 F.2d at 121.

Judge Kaufman observed that "[t]he drawing of standards in this area is a most difficult enterprise," because "[o]n the one hand, it is essential to avoid the Scylla of a rule which permits a finding of fiduciary duty on the basis of mere influence or minimum participation in the processes of government." *Id.* at 122.[9] Such a rule would "threaten to criminalize a wide

_____

[9] Some years after *Margiotta* upheld an honest-services theory of mail fraud, the Supreme Court construed the federal mail fraud statute, 18 U.S.C. § 1341,

35

range of conduct, from lobbying to political party activities, as to which the public has no right to disinterested service." *Id.* On the other hand, "the harm to the public arising from the sale of public office and other fraudulent schemes leads us to steer a course away from the Charybdis of a rule which bars on all occasions, as a matter of law, a holding that one who does not hold public office owes a fiduciary duty to the general citizenry even if he in fact is conducting the business of government." *Id.*

The *Margiotta* Court observed that while "there is no precise litmus paper test," it found two measures of fiduciary status helpful in that context: (1) a reliance test, under which one may be a fiduciary when others rely upon him because of a special relationship in the government, and (2) a de facto control test, under which a person who in fact makes governmental decisions may be held to be a governmental fiduciary. *Id.*

> These tests recognize the important distinction between party business and government affairs, permitting a party official to act in accordance with partisan preferences or even whim, up to

to reach only schemes to deprive victims of money or property. *See United States v. McNally*, 483 U.S. 350 (1987). Following *McNally*, Congress enacted 18 U.S.C. § 1346 to include "the intangible right of honest services" within the ambit of the federal fraud statutes.

36

the point at which he dominates government. Accordingly, the reliance and de facto control tests carve out a safe harbor for the party leader who merely exercises a veto power over decisions affecting his constituency.

*Id*.

In turn, although *Chestman* adopted *Margiotta*'s measure of a fiduciary duty for a political leader, such a measure is not necessarily appropriate for other cases in other contexts. Significantly, as Judge Robert Ward—who was sitting by designation on the *Margiotta* panel and who cast the deciding vote in this aspect of the case—later wrote, "the analysis in *Margiotta* was directed at the precise parameters of the facts involved in that case." *United States v. Reed*, 601 F. Supp. 685, 708 n.35 (S.D.N.Y. 1985). Judge Ward did "not read *Margiotta* or any other decision of the Second Circuit as establishing a controlling definition of the confidential relationship concept to be applied in a variety of contexts, and particularly in the instant case [before him]." *Id*. We agree.

Consistent with Judge Ward's analysis, and without reference to the *Margiotta* factors, this court subsequently held that under New York law, a fiduciary relationship arises "when one [person] is under a duty to act for or

37

to give advice for the benefit of another upon matters within the scope of the relation." *Flickinger v. Harold C. Brown & Co.*, 947 F.2d 595, 599 (2d Cir. 1991) (internal quotation omitted).[10] And *Chestman* itself set out two other tests, immediately after quoting from *Margiotta*, one of which is the traditional test that one acts as a fiduciary when

> the business which he transacts, or the money or property which he handles, is not his own or for his own benefit, but for the benefit of another person, as to whom he stands in a relation implying and necessitating great confidence and trust on the one part and a high degree of good faith on the other part.

---

[10] Indeed, three decades later, the New York Court of Appeals defined a fiduciary relationship as "a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *Oddo Asset Mgmt. v. Barclays Bank PLC*, 19 N.Y.3d 584, 592–93 (2012). Likewise, two years ago, this court again restated the definition of a fiduciary set out in *Flickinger* and quoted the following summation of such a duty under New York law: "Broadly stated, a fiduciary relationship is one founded upon trust or confidence reposed by one person in the integrity and fidelity of another. It is said that the relationship exists in all cases in which influence has been acquired and abused, in which confidence has been reposed and betrayed." *Galvstar Holdings, LLC v. Harvard Steel Sales, LLC*, 722 F. App'x 12, 15 (2d Cir. 2018) (quoting *Penato v. George*, 52 A.D.2d 939, 942 (2d Dep't 1976)). None of these cases described the *Margiotta* factors as a prerequisite to fiduciary or fiduciary-like status, although that standard is occasionally cited in other cases. *See, e.g.*, *AG Cap. Funding Partners*, 11 N.Y.3d at 158.

947 F.2d at 568–69 (quoting Black's Law Dictionary (5th ed. 1979)). This traditional test aptly describes the relationship between Kosinski and Regado.

Moreover, *Chestman* indicated that the result in that case, which involved the transmittal of inside information in the context of a family relationship, might have been different had the transmittal been in breach of an "express agreement of confidentiality." *Id.* at 571. Significantly, the *Chestman* court in 1991 expressed approval for Judge Ward's 1985 opinion in *Reed* that "the repeated disclosure of business secrets between family members may *substitute* for a factual finding of dependence and influence and thereby sustain a finding of the functional equivalent of a fiduciary relationship." *Id.* at 569 (emphasis added).

Perhaps most significant is then-Judge Sotomayor's opinion in *Falcone*, which holds that a fiduciary relationship can arise so long as "the party in whom confidence is reposed has entered into a relationship in which he or she acts to serve the interests of the party entrusting him or her with such information," 257 F.3d at 234–35, without referencing a showing of "de facto

39

control and dominance," *Chestman*, 947 F.2d at 568.  Indeed, and perhaps for these reasons, Kosinski concedes that he "has never maintained" that only contracts bearing what he calls "'the hallmarks of a traditional fiduciary relationship' can create the necessary duty" sufficient to sustain insider trading liability.  Reply Br. at 7 n.2.

In sum, *Chestman*'s three-factor standard of "reliance, and de facto control and dominance" does not state the exclusive test of fiduciary status, nor the proof necessary to sustain a conviction under the misappropriation theory.  The cases cited by Kosinski that employ the standard of "reliance, and de facto control and dominance,"[11] Reply Br. at 4, did so (in the words of the Supreme Court) in the context of "other federal fraud statutes" and do not advance his cause here, in the context of insider trading. *Salman*, 137 S. Ct. at 428.  Indeed, in *Salman* in 2016, the Supreme Court merely "assum[ed]" that such "cases are relevant to our construction of §10(b) (a proposition the

---

[11] *See United States v. Halloran*, 821 F.3d 321, 338–39 (2d Cir. 2016); *United States v. Skelly*, 442 F.3d 94, 99 (2d Cir. 2006); *United States v. Szur*, 289 F.3d 200, 210 (2d Cir. 2002); *United States v. Brennan*, 183 F.3d 139, 150 (2d Cir. 1999).  Of these cases, only *Halloran* turned on the application of this standard.

Government forcefully disputes)[.]" *Id.* In light of our discussion of the limitations of the history and application of *Chestman*'s three-factor standard, we see no reason to extend it here merely because it has been repeated in other contexts. Thus, while the evidence here was indeed sufficient to find that Kosinski owed Regado a fiduciary duty based on reliance, control, and dominance, that conclusion does not signal that only such factors can establish a fiduciary duty for purposes of determining insider-trading liability.

### D.   The Jury Instruction On Breach Of Duty

Kosinski contends that the district court erred in instructing the jury that "a person has a requisite duty of trust and confidence whenever a person agrees to maintain information in confidence." Gov't App'x at 1151. He maintains that this instruction "effectively directed a verdict in favor of the government" because it was undisputed at trial that Kosinski had agreed, per the CSRA, to keep Regado's information confidential. *See* Appellant Br. at 40.

41

"We consider a jury instruction erroneous 'if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law.'" *United States v. Silver*, 864 F.3d 102, 118 (2d Cir. 2017) (quoting *United States v. Finazzo*, 850 F.3d 94, 105 (2d Cir. 2017)). Even where an instruction is erroneous, we will affirm if it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *United States v. Sheehan*, 838 F.3d 109, 121 (2d Cir. 2016) (internal quotation marks and citation omitted).

We need not decide here whether the district court's instruction to the jury that "a person has a requisite duty of trust and confidence whenever a person agrees to maintain information in confidence" was erroneous. Assuming *arguendo* that it was, any error in the instruction was harmless. As discussed *supra*, the trial evidence overwhelmingly established that Kosinski had a fiduciary or fiduciary-like duty to Regado, and we are convinced "that a rational jury would have found [Kosinski] guilty absent the error." *Sheehan*, 838 F.3d at 121 (internal quotation marks omitted).

## II.  **Willfulness**

Kosinski argues that the district court gave an improper jury instruction on the willfulness element of his alleged breach of his fiduciary duty, and that the evidence was insufficient to prove willfulness under the proper standard.

Section 32(a) of the Securities Exchange Act provides that:

> Any person who <u>willfully violates</u> any provision of this chapter . . . , or any rule or regulation thereunder the violation of which is made unlawful or the observance of which is required under the terms of this chapter . . . shall upon conviction be fined not more than $5,000,000 or imprisoned not more than 20 years, or both . . . ; but no person shall be subject to imprisonment under this section for the violation of any rule or regulation if he proves that he had no knowledge of such rule or regulation.

15 U.S.C. § 78ff(a) (emphasis added). Thus, Kosinski must have "willfully violate[d]" § 10b and Rule 10b–5 to be held criminally liable for such violations.

43

## A.    The Jury Instructions

The trial judge gave the jury the following relevant instruction on what the judge called "the second element [of the offense]: knowledge, intent, and willfulness":

> The second element that the Government must prove beyond a reasonable doubt is that the defendant participated in the scheme to defraud knowingly, willingly, and with the intent to defraud. To act knowingly means to act voluntarily and deliberately rather than mistakenly or inadvertently. To act willfully means to act knowingly and purposefully with the intent to do something that the law forbids, that is, with bad purpose either to disobey or to disregard the law. . . . It is not required that the Government show that Dr. Kosinski, in addition to knowing what he was doing and deliberately doing it, also knew that he was violating some particular statute. But the defendant must have acted with knowledge and intent to carry out the insider trading scheme.

GA 1154–55.

Kosinski argues that the above instruction failed to adequately convey that Kosinski's guilt required that he knew that his conduct was unlawful under the securities laws.  The government responds that the instruction accurately explained the willfulness requirement, which does not require any knowledge that the defendant knew he was violating the securities laws.

44

At the outset, we observe that Kosinski did not request an instruction

that he must have known he was violating the *securities laws*, an omission

that would normally limit our review to plain error.  *See* Fed. R. Crim. P.

52(b). Here, however, Kosinski's conduct may have amounted to waiver,

and not merely forfeiture, which would preclude even plain error review.[12]

Contrary to Kosinski's argument on appeal, he appears to have

endorsed the substance of the given charge. We have explained that "if a

party invited the charge . . . she has waived any right to appellate review of

the charge." *United States v. Giovanelli*, 464 F.3d 346, 351 (2d Cir. 2006).

Kosinski's own request to charge defined "willful conduct" as a "voluntary,

intentional violation of a known legal duty and is synonymous with conduct

---

[12] It is well established that waiver is different from forfeiture. *See United States v. Olano*, 507 U.S. 725, 733 (1993) ("Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right."). We have explained that "[i]f a party's failure to take an evidentiary exception is simply a matter of oversight, then such oversight qualifies as a correctable 'forfeiture' for the purposes of plain error analysis." *United States v. Yu-Leung*, 51 F.3d 1116, 1122 (2d Cir. 1995). "If, however, the party consciously refrains from objecting as a tactical matter, then that action constitutes a true 'waiver,' which will negate even plain error review." *Id*.

that is done with bad purpose or evil motive either to disobey or to disregard the law." Gov't App'x at 1276. In this respect, it was identical to the district court's charge. And the defense repeated this position at the charge conference: "Your Honor, our position really just is that the instruction needs to be clear that the willfulness requires a showing that the defendant had knowledge that his conduct was unlawful." *Id.* at 1226. "Such endorsement might well be deemed a true waiver, negating even plain error review." *United States v. Hertular*, 562 F.3d 433, 444 (2d Cir. 2009).

Even assuming *arguendo* that Kosinski's conduct at trial constituted correctable forfeiture, however, Kosinski still cannot demonstrate error, and certainly not plain error. The Supreme Court has held that, "[a]s a general matter, when used in the criminal context, a 'willful' act is one undertaken with a 'bad purpose.' In other words, in order to establish a 'willful' violation of a statute, 'the Government must prove that the defendant acted with knowledge that his conduct was unlawful.'" *Bryan v. United* States, 524 U.S. 184, 191–92 (1998) (quoting *Ratzlaf v. United States*, 510 U.S. 135, 137 (1994)). Moreover, in *Bryan*, the Court approved a willfulness charge

46

instructing that so long as a defendant "act[s] with the intent to do something that the law forbids," he need not be aware "of the specific law or rule that his conduct may be violating." *Id.* at 190 (quoting jury instructions).

While *Bryan* made these pronouncements in the context of a federal firearms conviction, this court has recognized that its definition of willfulness is generally applicable. As a general matter, "a person who acts willfully need not be aware of the specific law that his conduct may be violating. Rather, 'knowledge that the conduct is unlawful is all that is required.'" *United States v. Henry*, 888 F.3d 589, 599 (2d Cir. 2018) (quoting *Bryan*, 524 U.S. at 196). When a statute limits criminal liability to "willful" violations, it does not necessarily "carve out an exception to the traditional rule that ignorance of the law is no excuse." *Bryan*, 524 U.S. at 195–96.

A heightened standard of willfulness, demanding "[k]nowledge of the specific law that one is violating[,] has been required only where a 'highly technical statute[]'—such as a provision of the Internal Revenue Code—prohibits 'apparently innocent conduct.'" *Henry*, 888 F.3d at 599 (quoting

*Bryan*, 524 U.S. at 196).[13] The insider trading activities that Section 10(b) and Rule 10b–5 prohibit, by contrast, cannot be described as "apparently innocent." *Henry*, 888 F.3d at 599; *see United States v. O'Hagan*, 139 F.3d 641, 647 (8th Cir. 1998) (recognizing that § 10(b) violations "necessarily involve[] fraudulent conduct and breaches of duty by the defendant," and "do not involve conduct that is often innocently undertaken").

*United States v. Cassese*, 428 F.3d 92 (2d Cir. 2005), relied on by Kosinski, is not to the contrary. While the panel majority there defined willfulness as "'a realization on the defendant's part that he was doing a wrongful act' *under the securities laws*," *see id.* at 98 (emphasis added) (quoting *United States v. Peltz*, 433 F.3d 48, 55 (2d Cir. 1970)), this court has since clarified that the highlighted language did not depart from precedent to require a securities

---

[13] *See, e.g.*, *Cheek v. United States*, 498 U.S. 192, 205 (1991) (stating that, in some tax cases, willfulness requires defendant's knowledge of specific legal duty violated because "uncertainty" about "our complex tax system . . . often arises even among taxpayers who earnestly wish to follow the law"); *see also Ratzlaf v. United States*, 510 U.S. 135, 136, 144 (1994) (stating same as to statutory prohibition against structuring of cash transactions to avoid triggering financial institutions' legal reporting requirement, conduct that "is not inevitably nefarious").

defendant's awareness of more than the general unlawfulness of his conduct. *United States v. Kaiser*, 609 F.3d 556, 569 (2d Cir. 2010).[14]

All in all, Kosinski's challenge fails because he cannot demonstrate that the purported error is plain, much less that he sustained any prejudice or that the fairness, integrity, or public reputation of his judicial proceedings was called into question. *See Olano*, 507 U.S. at 732–37.

## B. <u>Legal Sufficiency</u>

Although we review a defendant's challenge to the sufficiency of the evidence de novo, "we will uphold the judgment[] of conviction if '*any* rational trier of fact could have found the essential elements of the crime

---

[14] As *Kaiser* observed, the *Cassese* majority "did not reach the question of whether willfulness required only awareness of general unlawfulness or whether it required that the defendant knowingly commit the specific violation charged," finding the evidence insufficient as a matter of law under either standard. 609 F.3d at 569; *see Cassese*, 428 F.3d at 95. Only Judge Raggi, in dissent, analyzed the appropriate standard, and concluded—correctly—that the "only proof of knowledge required to establish a willful violation of the Exchange Act is the defendant's awareness of the general unlawfulness of his conduct." *Cassese*, 428 F.3d at 109. Thus, *Cassese* does not clearly establish the willfulness standard urged by Kosinski, as necessary for the first two prongs of plain error. But the point warrants no further discussion because *Kaiser* makes plain that Kosinski cannot show *any* charging error.

beyond a reasonable doubt,'" *Martoma*, 894 F.3d at 72 (quoting *Jackson*, 443 U.S. at 319). "In evaluating a sufficiency challenge, we must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and . . . uphold[ing] the judgment of conviction if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (internal quotation marks, brackets, and emphasis omitted).

Viewed in the light most favorable to the government, the trial evidence was sufficient to allow a rational jury to conclude that Kosinski's insider trading was willful under the instruction given by the district judge, which was consistent with Kosinski's own request and the law. The jury heard evidence that Kosinski was a "sophisticated investor," particularly "in the pharmaceutical sector" who regularly dealt in options. Gov't App'x at 565, 1007. Indeed, while working as principal investigator for Regado, he not only traded to avoid a loss of $160,000, but also, after learning that a patient had died, he traded to profit from that inside information by purchasing put options. The government presented evidence that Kosinski

50

knew that he was trading on nonpublic inside information, based on his receipt of the information at issue pursuant to a confidentiality agreement as well as his subsequent admissions that he did not feel good about the trades at the time he made them (that they were the product of "greed and stupidity"). Indeed, the admissions by themselves might suffice to show he knew his conduct violated the law.

There is more evidence indicating willfulness. Kosinski was only able to engage in the charged conduct because of lies and deceit. First, in breach of his contract with Regado, he failed to advise Regado that he had accumulated far more than the minimal stock holdings in that company that he was permitted to own without disclosure. And he failed to do so even though he had been told that such disclosure was crucial to the FDA. Nor did he disclose his use of Regado's inside information to trade in the manner in which he did. Moreover, he lied to St. Vincent's Hospital, which was also a party to the CSRA with Regado when, in seeking its permission to conduct the Study there, he falsely stated that he did not own any Regado shares in response to a specific inquiry.

Taken together, this evidence of Kosinski's deceptive activity was sufficient for the jury to find that Kosinski knew his actions were unlawful under the charge given by the district court.

III. **The District Court's Evidentiary Rulings Did Not Abuse Its Discretion**

Kosinski sought to elicit testimony from FBI agent McGoey on cross examination that in the same August 2016 five-minute telephone conversation in which Kosinski stated that he "didn't feel good about making those trades when he had made them" and described his conduct as motivated by "greed and stupidity," *see supra* at 14, he also made two other statements: (i) before McGoey informed Kosinski that he had been indicted, Kosinski told him that he had not yet retained counsel, and (ii) after McGoey informed Kosinski that he had been indicted, Kosinski said "I can't believe this is happening." Over Kosinski's objections, the district court excluded those statements as inadmissible hearsay. Kosinski now challenges those rulings, arguing that both statements were admissible under the rule of completeness and as excited utterances.

"We review a district court's evidentiary rulings under a deferential abuse of discretion standard, and we will disturb an evidentiary ruling only where the decision to admit or exclude evidence was 'manifestly erroneous.'" *United States v. Litvak*, 889 F.3d 56, 67 (2d Cir. 2018) (quoting *United States v. McGinn*, 787 F.3d 116, 127 (2d Cir. 2015)).

### A. Kosinski's Statement That He Had Not Retained Counsel

We reject Kosinski's argument that his statement that he had not retained counsel was an excited utterance. First, Kosinski concedes he made that statement before Agent McGoey informed him of the indictment. Second, Kosinski's resort to the argument that "the phone call from the FBI was itself a startling event" under Federal Rule of Evidence 803(2) is without merit, particularly since he had already spoken with the FBI approximately two months earlier. Nor did the district court abuse its discretion by declining to admit this statement under the rule of completeness. *See United States v. Johnson*, 507 F.3d 793, 796 & n.2 (2d Cir. 2007) (no error where court could reasonably conclude that the statement was not "relevant to the admitted passages"); *see* FED. R. EVID. 106.

53

**B.** <u>**Kosinski's Statement That He "Can't Believe This Is Happening"**</u>

We likewise conclude that the district court did not abuse its discretion by excluding Kosinski's second statement to Agent McGoey—that "I can't believe this is happening"—when McGoey told him he had been indicted. While learning that one has been indicted could perhaps under certain circumstances be a startling event, those circumstances are not present here. Kosinski had spoken with Agent McGoey for close to an hour and a half about two months prior about "Dr. Kosinski's trading in Regado," which Kosinski knew was based on nonpublic, inside information. Gov't App'x at 421–22. The parties, however, stipulated not to elicit any testimony from that first conversation in order to avoid a "hearsay fight" over the admissibility of certain of Kosinski's statements. *Id.* at 423.

Because of that stipulation, the district court did not have sufficient information—and neither do we—to determine whether Kosinski's indictment was startling despite what he could have gleaned from the earlier conversation: namely, that he was possibly a subject or target of the FBI's investigation for insider trading. Under these circumstances, we cannot say

that the district court's decision to exclude this statement was "manifestly erroneous." *Litvak*, 889 F.3d at 67. Nor was the statement necessary under the rule of completeness to place into context Kosinski's comments introduced by the government, which did not relate to this statement by Kosinski.

## CONCLUSION

The judgment of conviction is AFFIRMED.